**KENTILE FLOORS, INC., Appellant,**

v.

**Clifford L. WINHAM and Corinne Winham, Bankrupts, Appellees.**

**No. 23565.**

United States Court of Appeals, Ninth Circuit.

April 12, 1971.

Beverly H. McConnell (argued), of Wilson & McConnell, Phoenix, Ariz., for appellant.

Rod Wood (argued), Stark & Wood, Phoenix, Ariz., for appellees.

Before MURRAH,* HAMLEY and BROWNING, Circuit Judges.

HAMLEY, Circuit Judge:

In this bankruptcy proceeding a creditor, Kentile Floors, Inc. (Kentile), objected on several grounds to the general discharge of the bankrupts, Clifford L. Winham and Corinne Winham, who operated Winham's Floor Coverings, a sole proprietorship. After a hearing, the referee held for Kentile on all grounds asserted, and denied a general discharge. On review the district court rejected the referee's findings and held that the Winhams were entitled to a general discharge. This appeal followed.

For a number of years the Winhams operated a small residential floor covering business in Phoenix, Arizona. In 1963 they ventured into the field of commercial floor coverings. Previously they had been procuring materials through Kentile's distributor. Discussions between the Winhams and representatives of Kentile, early in 1964, resulted in an arrangement involving purchases directly from Kentile.

Under this arrangement, Kentile granted the Winhams credit in the amount of $75,000, which was sufficient to handle the commercial jobs the latter

---

* The Honorable Alfred P. Murrah, Senior United States Circuit Judge from the Tenth Circuit, sitting by designation.

then had under contract. Kentile thereafter extended credit whenever it filled an order for materials placed by the Winhams. When bankruptcy proceedings were instituted in 1965 the balance of the Winham account with Kentile was approximately $60,000.

■ Kentile's objections to discharge, upheld by the referee, but rejected by the district court, are based on section 14(c) (1), (c) (3) and (c) (7) of the Bankruptcy Act (Act), 11 U.S.C. § 32(c) (1), (c) (3) and (c) (7). The referee's findings of fact dealing with these objections are to be upheld unless they are clearly erroneous. See General Order in Bankruptcy, No. 47. This calls for a review of the entire record to determine whether a mistake has been made. Hudson v. Wylie, 242 F.2d 435, 450 (9th Cir. 1957). See also, United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

One of the objections, based on section 14(c) (1) of the Act, is that the bankrupts knowingly and fraudulently concealed from the receiver, trustee and the court cash on hand and accounts receivable. This charge is based on the fact that, in their bankruptcy schedules and oral testimony at the first meeting of the creditors, they stated that they had only $24.50 cash on hand at the time of filing their petitions, whereas they actually had $2,175.00 cash on hand. The bankrupts also omitted from their schedules of assets, accounts receivable from the brother of the bankrupt Clifford L. Winham in the sum of $3,460.28, together with other receivables from employees, including the son of bankrupts, in the sum of $683.00.

■ The referee found the bankrupts knew of the existence of these assets when they filed their schedules. However, the record indicates that the omission of the assets from the schedules was the result of oversight and misunderstanding; in one instance a bookkeeper's clerical error, in the other, a misinterpretation of legal advice. The affirmance of the schedules under oath

occurred under similar circumstances. The record therefore does not warrant the conclusion that these acts of the bankrupts were knowing and fraudulent.

Kentile's objection to discharge based on section 14(c) (7) of the Act, failure to satisfactorily explain losses of assets or deficiency of assets to meet liabilities, was upheld by the referee on the ground that the bankrupts were unable to state the amount of loss attributable to the various factors which the bankrupts testified caused their financial demise. Their explanation, instead, attributed the loss to the following four factors with no calculation as to the amount of loss these factors caused: bankrupts' lack of experience in commercial jobs, a loss on the Fort Carson job, a labor strike in Phoenix, and a loss on the Mayer Central job.

■ The business records of the bankrupts are complete and accurate. The trustee prepared the bankrupts' tax return from the business records for the period in question. The bankrupts suffered a substantial tax loss for this period. The amounts of the particular losses were available from the business records. There is no suggestion of culpable conduct in the management of the business. Even the trustee, Kentile's witness at the hearing, testified that there was nothing in the business records that would alert him to some area or account where an unusually large sum of money had disappeared. Kentile does not dispute the occurrence of the factors mentioned by the bankrupts, nor that they injured the bankrupts' business. Under all the circumstances, we do not think the explanation was unsatisfactory. Cf. Rameson Brothers v. Goggin, 241 F.2d 271 (9th Cir. 1957).

Kentile also objected to a general discharge because Winham's Floor Coverings obtained extensions of credit by publishing materially false financial statements. See section 14(c) (3) of the Act. Both the referee and the district court found materially false financial statements were published by the bankrupts as sole proprietors of Win-

ham's Floor Coverings. The referee found that Kentile relied on the statements when it subsequently extended credit. The district court found that Kentile did not rely on the statements, and that Kentile had no right to rely on them.

■■ The record discloses that Mr. Winham intentionally modified the true figures on his statement of financial condition for the purpose of showing a good statement. He acknowledged that he felt that if a correct statement were submitted, his credit would be curtailed. After receiving the statements, Kentile did extend further credit to Mr. Winham. While the law favors discharges in bankruptcy, it will not ordinarily tolerate the bankrupt's intentional departure from honest business practices where there is a reasonable likelihood of prejudice. A bankrupt who admits that he prepared false financial statements in an effort to obtain or retain credit standing, and who thereafter achieves that goal, has a heavy burden to carry in trying to show that the false statement was not, or should not have been, instrumental in the subsequent extensions of credit.[1]

■ Reliance on the financial statements is necessary to preclude discharge for violation of section 14(c) (3). Rogers v. Gardner, 226 F.2d 864 (9th Cir. 1955). Notwithstanding the bankrupts' heavy burden of proof, referred to above, we agree with the district court that whatever reliance Kentile placed upon these statements was not reasonable reliance, that Kentile therefore had no right to rely upon the statements in

this situation, and that the bankrupts should not, on this ground, be denied a general discharge.

A recitation of the facts surrounding the submission of the financial statements and subsequent extensions of credit is necessary to illustrate why Kentile should have been alerted to the actual financial condition of Winham's Floor Coverings and why Kentile should not have relied upon the financial statements without further investigation.

As noted above, the bankrupts had been dealing with Kentile, through its distributor, for a period of time before the arrangement for direct purchases from Kentile was consummated early in 1964. The arrangement corresponded somewhat with the bankrupts' entrance into the field of commercial floor coverings. Kentile acknowledged the bankrupts' history of prompt payment prior to 1965. Kentile further acknowledged representatives had been calling on the bankrupts from time to time for the purpose of reviewing the bankrupts' business records. When Kentile began extending credit to the bankrupts, it did not require publication of a statement of financial condition as a prerequisite.

In the spring of 1965 the bankrupts' payments on the account had become sporadic. Kentile's credit manager stated that the payments were "not satisfactory." The record indicates that Kentile was then seriously considering curtailment of Winhams' credit. Kentile was also aware of Winhams' sporadic payments on the account with Kentile's distributor. Kentile was, in fact, aware of many of the difficulties with which the bankrupts were beset in early 1965.[2]

---

1. We are also mindful of the possibility that granting a discharge to a bankrupt guilty of deliberate falsification may tend to encourage similar conduct in others. Under the facts here, however, that possibility is quite remote. There is no indication that Winham was concerned with bankruptcy or a bankruptcy discharge when he determined to falsify his financial statements. Winham testified, and there is no evidence supporting an inference to the contrary, that he sought further credit

from Kentile in an effort to improve his financial condition, to make his business once again profitable. There is no indication that Winham intended to obtain credit in the hopes he would not be held accountable for the debt. As noted above, Winham's business records are complete and accurate and do not indicate that he was squandering the assets of the business.

2. One large commercial project was on the verge of bankruptcy, and Kentile knew

By March 1965, Kentile had begun to insist that the bankrupts supply a statement of financial condition. Before having received any financial statement from the bankrupts, however, Kentile had extended approximately $96,000 in credit. This was the amount due Kentile from the bankrupts when the first financial statement was submitted in April 1965. The statement purported to reflect the financial condition of Winham's Floor Coverings as of December 31, 1964. Kentile was aware of the financial problems the bankrupts had experienced in the interim. Kentile also knew that the total of all Winhams' accounts payable on December 31, 1964, as reflected in the financial statement, was substantially less than the amount Winhams owed Kentile and its distributor when the statement was received in April 1965.

Kentile's credit manager was somewhat equivocal when asked the significance that could be placed on a financial statement such as this. The financial condition reported in the statement seemed, to the credit manager, inconsistent with the manner in which the bankrupts were making payments on the account.

The second financial statement submitted by Winham was received by Kentile in June 1965, and purported to reflect the financial condition as of March 31, 1965. This statement, compared with the first statement, showed an improvement during the first quarter of 1965, contrary to all other information available to Kentile. Credit was curtailed shortly after its receipt. Credit was not curtailed because Kentile discovered the bankrupts' true financial condition, but because the payments on the account were not satisfactory.

Given the lengthy and apparently fairly close business relationship of Kentile and Winham's Floor Coverings, we do not think further investigation by Kentile would have damaged that relationship had Winham's been a going concern. We therefore think Kentile acted unreasonably if it relied upon the first statement in extending credit without any further investigation of the bankrupts' then existing financial condition. While a financial statement is not necessarily unreliable because it reflects the condition as it existed three or four months earlier, Kentile's knowledge of what occurred in the interim was sufficient to require further inquiry. Reliance on the second statement, showing an improvement of condition in the interim, was similarly unjustified.

Affirmed.

that Winham stood to lose a substantial sum of money on the project. Kentile knew that the bankrupts were having difficulty collecting money from many of their commercial accounts. Kentile also knew of the labor troubles the bankrupts were experiencing on other commercial jobs and knew, or should have known, how Winhams' business would be affected.