Glen McDOWELL, Appellee,

v.

**JOHN DEERE INDUSTRIAL EQUIP-MENT CO. and John Deere Company of Lansing, Inc., Appellants.**

No. 71–2074.

United States Court of Appeals, Sixth Circuit.

May 26, 1972.

Thomas R. Roberts, Lansing, Mich., for appellants; Foster, Lindemer, Swift & Collins by Philip T. Carter, Lansing, Mich., on brief.

Edward H. Dembowski, Marquette, Mich., for appellee.

Before PHILLIPS, Chief Judge, KENT, Circuit Judge, and FEIKENS, District Judge.*

FEIKENS, District Judge.

Glen McDowell, doing business as McDowell Implement Company, represented the John Deere Company of Lansing, Inc., and the John Deere Industrial Equipment Company (referred to herein simply as "John Deere") as its dealer in the Rudyard, Michigan, area for some sixteen years.

On November 10, 1969, he filed a voluntary petition in bankruptcy. John Deere, the principal creditor, objected to discharge, and the Referee in Bankruptcy, following hearing, sustained five objections and denied discharge under Section 14(c) (3)[1] of the Bankruptcy Act (11 U.S.C. § 32).

McDowell then filed a petition for review of that ruling under 11 U.S.C. § 67.[2] The United States District Court for the Western District of Michigan reviewed the Referee's findings, took additional testimony from McDowell, reversed the Referee, and denied John Deere's objections to discharge. From that ruling John Deere appeals. We affirm.

During the many years of their business relationship, John Deere shipped farm and related equipment to McDowell and, pending sale, retained security interests therein. When a sale occurred where financing was necessary this, too, would be handled by John Deere. It would likewise arrange floor planning on used farm machinery received by McDowell as trade-ins. Credit to McDowell was effectuated by the execution of "floor plan notes" which gave John Deere a security interest in the used machinery. Such credits, if made, reduced the monthly cash settlement required of McDowell by John Deere.

John Deere's objections to discharge concerned these floor plan notes. In its ruling, the District Court adopted the Referee's detailed findings that McDowell's statements in the documents evidencing these transactions contained untrue factual assertions.[3]

An essential element necessary to deny discharge under Section 14(c) (3) is a showing that the creditor has relied on the untrue statements. This was resolved against John Deere. The District Court stated: "A substantial question arises, however, as to whether or not the bankrupt really intended to fool anybody at John Deere regarding his financial condition."[4] In applying Section 14(c) (3), the Referee found that McDowell's statements in the floor plan

---

*Honorable John Feikens, Judge of the United States District Court for the Eastern District of Michigan, sitting by designation.

1. "The court shall grant the discharge unless satisfied that the bankrupt has . . . (3) obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing or causing to be made or published in any manner whatsoever, a materially false statement in writing respecting his financial condition; . . ."

2. "A person aggrieved by an order of a referee may, within ten days after the entry thereof or within such extended time as the court . . . may for cause shown allow, file with the referee a petition for review of such order by a judge and serve a copy of such petition upon the adverse parties who were represented at the hearing . . . "

3. Appendix, p. 171, Opinion, Honorable Noel P. Fox: "These findings appear to be soundly based and are entitled to respect by this court."

4. Appendix, p. 172.

documents were false, and he devoted an extensive portion of his opinion to specific findings. Nonetheless, he simply made a two-sentence finding as to the matter of reliance:

"I find that John Deere made reliance upon the written representations that were made by Mr. McDowell to obtain credit and that credit was given in reliance thereon,"

and

". . . I find no evidence that John Deere knew of these deceptions until on or about November 1969." (Appendix, pp. 151, 152).

■ Unless these findings are clearly erroneous, the findings of the Referee must be upheld.

"Unless otherwise directed in the order of reference the report of a referee or of a special master shall set forth his findings of fact and conclusions of law, and the judge shall accept his findings of fact unless clearly erroneous . . ." No. 47, General Orders in Bankruptcy.

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1947).

■ It has long been the rule in this Circuit that the District Judge should not disturb the findings of fact of a Referee in Bankruptcy unless there is most cogent evidence of mistake or miscarriage of justice. In Kowalsky v. American Employers Ins. Co. of Boston, Mass., 90 F.2d 476, 479 (6th Cir. 1937), we said:

"In Ohio Valley Bank Co. v. Mack, [6 Cir.,] 163 F. 155, 158, 24 L.R.A. (N. S.) 184, . . . 'No arbitrary rule can be laid down for determining the weight which should be attached to a finding of fact by a bankrupt referee. His position and duties are analogous, however, to those of a special master directed to take evidence and report his conclusions, and the rule applicable . . . must be substantially that applicable to a master's report . . .'"

See also, In Re Newman, 126 F.2d 336 (6th Cir. 1942).

■■ However, the relationship between a District Judge and a Referee in the administration of the law is closer than the relationship between a Court of Appeals and a District Court. The Referee is an arm of the District Court. Although the clearly erroneous standard applies to the findings of the Referee, General Order 47 [5] also directs the court when appropriate to accept, reject, or modify the Referee's finding. See Rait v. Federal Land Bank of St. Paul, 135 F.2d 447 (8th Cir. 1943).

■■ Thus, the question before us is whether or not there is substantial evidence to support the Referee's conclusion that John Deere relied upon McDowell's written representations to obtain credit. The Referee's findings must be upheld if supported by substantial evidence. This means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ A close examination of both the joint appendix and the transcript reveals that the testimony is overwhelming in showing that John Deere not only did not rely on these written statements but also knew of the facts underlying the floor plan notes. There is little evidence as to reliance.

In Kentile Floors, Inc. v. Winham, 440 F.2d 1128 (9th Cir. 1971), the Court of Appeals upheld the District Court's reversal of a Referee's finding denying

---

5. ". . . The judge after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."

discharge. The court held that due to the close relationship of the parties and extensive supervision, the creditor was not justified in relying upon the representations of the bankrupt.

An analysis of the circumstances of the relationship between McDowell and John Deere demonstrates that there was no reliance in the instant case. It is significant that John Deere provided the entire bookkeeping system for McDowell, that the bookkeeper worked under John Deere's direction, that John Deere's personnel directed McDowell's bookkeeper in general bookkeeping problems, and told "her where accounts should be applied and how," that John Deere's field accountant and territorial manager would come monthly or more often to McDowell's place of business. John Deere's bookkeeping service was not free; it charged McDowell initially $100 a year (later $300). The scope of supervision even included other aspects of McDowell's business in which John Deere had no interest (for example, the sale of hay).

The territorial manager played a key role in the managment of McDowell's business. He would write up the floor plan notes and authorize extension of credit. Allen, a territorial manager, said that McDowell actually signed some of these floor plan notes, without reading them, taking Allen's "word for it." During his frequent visits to the dealership, he would verify the inventory and make monthly settlements. This verification was accomplished by actually walking around the premises and preparing a list and comparing it to the previous month's list. McDowell would then be required to account for all units of equipment including the trade-ins. Territorial Manager Dennis. Gearhard testified that shortages in equipment were not infrequently found and would simply be marked as out to a customer. Territorial Manager Dowd testified that worksheets would be prepared on all units of equipment to determine their actual worth. Finally, the monthly statements would be drawn up to determine how much money McDowell owed John Deere. In addition to these monthly statements, independent audits were made in August of each year; John Deere would audit more frequently. Furthermore, on renewal of his yearly contract (November 1) a detailed financial statement was required of McDowell.

Of significance in illuminating the knowledge that the territorial manager had concerning the floor planning notes is the further testimony of Harold Allen, who was employed by John Deere from December 1964 to April 1968.[6] There had been times when McDowell had difficulty in paying for equipment and shortages would occur. "Special arrangements" would then be made by the territorial manager for extension of additional credit. The shortage would then be covered by the territorial manager reporting that the equipment was either out on demonstration or out on loan.[7]

It is also significant that the Referee misconceived the nature and purpose of all this testimony. The Referee regarded the testimony regarding bookkeeping as "generalizations." He regarded testimony as to the role that the credit manager for John Deere played as being "irrelevant." He regarded the appearance of John Deere personnel and their field men at McDowell's place of business as "something that doesn't seem to be directed at the issues here."

Because of economic conditions in April 1969, McDowell sought additional time for repayment of floor plan notes.

---

6. This testimony appears in the transcript but not in the Joint Appendix.

7. "Q: Did you have any special problem about equipment shortages?
   A: I would say no more than the normal pieces of equipment here and there that are on demonstration or on rental, and so forth." (Transcript, pp. 133, 134).

On this occasion, there was considerable discussion with John Deere's auditor, Mr. Casey.[8] McDowell had had similar difficulty before. In 1959 and 1960 there were problems concerning the financing of notes.[9]

In describing this situation, McDowell said that he talked to Territorial Manager Waters. He quoted Waters as having said, "You're just as bad as you always were, not improving any."[10] ". . . He knew what I was doing. . . . This was going on for years so this is the way he showed us how to get the books up . . ."

Again, with reference to this matter of nonreliance, this significant testimony occurred:

"Q: Mr. Gearhard came to your place of business?

A: Yes.

Q: He noticed there were certain pieces of machinery missing?

A: Yes." (Transcript, p. 335).

Finally, this colloquy occurred in McDowell's testimony:

"Q: And then are these the circumstances that account for the fact that you paid out more money to John Deere than equipment that you took in during these periods that were cited earlier?

A: There was tremendous pressure to move these machines out because they kept telling me if I didn't move them out they wouldn't floor plan any more machines with me. I had to move them out or they were going to quit financing and there was tremendous pressure put on especially in early summer and from about April on and one reason was they were changing from Lansing to Moline and they kept telling me if I didn't clean up the repossessed machines they were going to quit which I couldn't operate so I had to try to move out these used machines." (Transcript, p. 255).

On review of the entire record, it is apparent, as it was to the District Judge, that a mistake had been made concerning the issue of reliance by the Referee. There is little evidence to indicate that

---

8. "Q: Did you have a discussion concerning these notes and floor plan, that is, the retail notes and the floor plan notes, with Mr. Casey that, according to his claim, they weren't according to company policy?

A: Yes, he told me that I had to try to straighten them up as far as I could and he wanted to know approximately how much I was short or how much we figured we were short and what was out on demonstration then was approximately $75,000.

Q: Now, on that did you and Mr. Casey have a discussion and someplace in that discussion did he say that he knew that his estimate was that you were about $75,000 short or, as you two discussed it, out on demonstration?

A: Yes, he said, 'Don't kid me, I know that you're about $75,000 short and do you think that you can come out of this mess?' and I said, 'Well, if you give me more time and work with me I can work out, but if you leave it the way it is, it's going to be awfully hard, but I will try,' and Carl Pletcher was in on that conversation too, and then we finally left the office and went down to the industrial and finished the discussion down there for an hour or so, and he knew I put on the statement, on that April statement, this is out at such-and-such a place and Casey being in the credit business as long as he was more or less knew—" (Appendix, pp. 114, 115).

9. "Q: Was there some problem about financing notes at that time?

A: Yes, same problem as now." (Transcript, p. 330).

10. "Q: Did he ask you whether you were sending in any better notes than you were in the old days to John Deere Company?

A: Yes, he asked me if my notes had improved any or what type of notes I was sending in now." (Transcript, p. 332).

John Deere relied upon anything in the extension of credit other than its own observations, investigations and audits. It is clear that the objecting creditor "knew, or should have known, the financial condition of the bankrupt[s]." Household Finance Corp. v. Groscost, 230 F.2d 608 (6th Cir. 1956).

Against this background, the District Court's finding becomes clear. The court said:

". . . The objectors in the instant case are no such distant or detached parties. John Deere all but owned McDowell. It held a comprehensive mortgage over virtually everything the bankrupt owned. It not only had full access to the bankrupt's books, it was actively involved in their preparation. It knew that at the time of the monthly settlements, the bankrupt, during a hectic business day, signed literally dozens of forms, statements and notes completed by John Deere personnel. It itself imposed great pressure on the bankrupt. John Deere did not even rely on statements collected and prepared by its own agents, the territorial managers, without double checking facts and figures at the home office. The transactions challenged here were, in reality, entirely in-house dealings.

"In such circumstances and upon evidence of such complete knowledge of the bankrupt's affairs held by the objectors, this court must not unrealistically restrict its perspective to the isolated narrow transactions focused upon by the objectors. This court of equity is not limited to such a fettered view.

"It is clear from this record that John Deere, faced with the pressing economic circumstances of 1969, in great need of liquid capital, and desirous of ultimately constricting and centralizing its corporate affairs, embarked upon a policy of squeezing all available cash out of its independent dealer and then forced him out of business, all the while preserving technical grievances which might serve to defeat a bankruptcy discharge . . ." (Appendix, pp. 176, 177).

Affirmed.