In re Jack YEISER, Jr., Bankrupt.

The BANK OF WAYNESBORO,
Plaintiff,

v.

Jack YEISER, Jr., Defendant.

Bankruptcy No. 79–10007.

United States Bankruptcy Court,
M. D. Tennessee.

Dec. 20, 1979.

Knox Bigham, Lewisburg, Tenn., for plaintiff.

C. C. Peterson, Waynesboro, Tenn., for defendant.

## MEMORANDUM

RUSSELL H. HIPPE, Jr., Bankruptcy Judge.

In this adversary proceeding a bank, the largest unsecured creditor of the bankrupt, seeks to have its debt excepted from the discharge under § 17a(2) of the Bankruptcy Act, 11 U.S.C. § 35a(2) (1976).[1] The bank alleges that it renewed several loans in reliance upon a materially false financial statement made by the bankrupt with the intent to deceive. It is undisputed that the bankrupt prepared and delivered to the bank a financial statement which indicated that his assets exceeded his liabilities when in fact they did not and that the bank would not have renewed his loans had his financial statement not shown that he had a positive net worth.

At the conclusion of the trial the court stated its finding, which has been incorporated in an order previously entered herein, to the effect that the bank had failed to prove that it had suffered any ascertainable monetary damage as a result of any action it may have taken or failed to take as a consequence of the false financial statement. The bank did not make any new loans to the bankrupt but merely renewed pre-existing loans.[2] The attorney for the bank has insisted that had the bank proceeded to collect the loans at the time that the false financial statement was obtained, it might have been successful in preventing the bankrupt from selling his interest in a certain tract of real property. No specific proof was offered relative to this contention, however, and the court can only view this possibility of what might have happened as mere speculation rather than as proof of damages. There is a question as to whether it is necessary to prove actual monetary damages in order to obtain relief under the second clause of § 17a(2), which was shifted from § 14 of the Act in 1960. Act of July 12, 1960, Pub.L.No. 86–621, 74 Stat. 409. This clause details all of the elements necessary for relief under the first clause of § 17a(2) except for damages, an omission which may be significant. *See A.G. Edwards & Sons, Inc. v. Fuqua.* Bk. No. 75–1842 (M.D.Tenn. March 1, 1979) (B.J.). This question has not been resolved by the court of appeals for this circuit. This court need not, however, consider the measure of relief available under this exception to the dis-

1. "A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . (2) are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive, . . . ."

2. In its complaint, in addition to the major renewal notes, the bank also referred to another note on which the bankrupt was liable as maker and three notes on which he was liable as endorser. The bank has not, however, pursued any relief for these relatively small debts, which total approximately $10,000.

charge since the bank has failed to establish that it renewed the loans "in reliance upon" the financial statement.

■ It is well settled that the creditor has the burden of proving that its debt comes within the § 17a(2) exception. *E. g., Public Finance Corp. v. Taylor*, 514 F.2d 1370 (9th Cir. 1975); *Brown v. Buchanan*, 419 F.Supp. 199 (E.D.Va.1975). To do so, the creditor must prove each of the required elements, including that the credit was extended "in reliance upon" the false financial statement. As that phrase has been construed by the courts, the creditor must prove actual reliance which was reasonable and justifiable under the circumstances. *McDowell v. John Deere Industrial Equipment Co.*, 461 F.2d 48 (6th Cir. 1972); *Kentile Floors, Inc. v. Winham*, 440 F.2d 1128 (9th Cir. 1971); *Household Finance Corp. v. Groscost*, 230 F.2d 608 (6th Cir. 1956); *In re Smith*, 424 F.Supp. 858 (M.D.Fla.1976); *In re Ducote*, 4 Bankr.Ct. Dec. 943 (W.D.La.1978) (B.J.); *In re Knight*, 10 C.B.C. 844, 847 (M.D.La.1976) (B.J.); *In re Halvorson*, 8 C.B.C. 1 (D.Minn. 1976) (B.J.); *In re Fleeger*, 9 C.B.C. 499 (W.D.Pa.1976) (B.J.); *In re Fried*, 2 Bankr. Ct.Dec. 197 (E.D.N.Y.1976) (B.J.); *In re Bratland*, 6 C.B.C. 685 (W.D.Wis.1975) (B.J.); *In re Bechard*, 6 C.B.C. 239, 242 (S.D.N.Y.1975) (B.J.); *In re Hodges*, 6 C.B.C. 65 (S.D.Fla.1975) (B.J.); *In re Arden*, 2 Bankr.Ct.Dec. 204, 207 (D.R.I.1975) (B.J.); *In re Blevins*, 1 Bankr.Ct.Dec. 1626 (S.D. Ohio 1975) (B.J.); *In re Lafky*, 1 Bankr.Ct. Dec. 310 (W.D.Wis.1974) (B.J.); *Friendly Finance Co. v. Stover*, 109 Ga.App. 21, 134 S.E.2d 837 (1964).

The bankrupt, and apparently his father before him, had been a substantial borrowing customer of the bank for a number of years. By the time that the financial statement was delivered to the bank on or about November 1, 1977, the bankrupt's total borrowings exceeded $125,000.00 and were evidenced by at least ten separate notes. Much of the money apparently had been borrowed for use in the bankrupt's business. He owned and operated a new car dealership which he had inherited from his father.

The board of directors of the bank was prompted to require the financial statement in question as a condition of renewing the bankrupt's loans when it learned that he had sold the new car dealership and had applied the proceeds toward the payment of loans at other banks. The president advised the bankrupt that a financial statement was required. The bankrupt assured the president that the debts would be paid and was furnished with a blank form which he took with him and completed without any assistance from anyone at the bank.

Although the total debt which the bankrupt desired to renew exceeded $125,000.00 he was provided with a one-page form captioned "Financial Statement for Small Loans". On the front of its form, the bankrupt indicated that he had a net worth of $42,950.00, with assets totalling $318,950.00 and liabilities totalling $276,000.00. The assets included real estate with an aggregate value of $227,500.00. On the reverse side of the form, the bankrupt itemized his real estate holdings in a schedule which contained the following legend across the top: "TITLE TO ALL REAL ESTATE LISTED IS IN MY NAME SOLELY AND UNENCUMBERED, EXCEPT AS SHOWN HEREON." In a column captioned "TITLE HELD IN NAME OF" the bankrupt entered his name only opposite real property identified as the "Chalk Creek" farm as well as his residence and another tract, all of which he owned not individually but with his wife as tenants by the entirety. In addition, the bankrupt indicated that stock in a corporation which published a newspaper devoted to horses, "The Racking Review," was "registered in name of" himself when in fact it was registered in the name of and owned by his wife. The bankrupt also failed to reveal that his mother had an interest in another tract of real property. It is only necessary, however, to focus on the misrepresentation of the ownership of the "Chalk Creek" farm. The value ascribed to it was $75,000.00. Thus, if it were deleted from the schedules as an asset of the bankrupt his net worth would drop to a negative figure. According to the testimo-

ny of the bank president, the loans would not have been renewed if the financial statement had shown the bankrupt to have a negative net worth.

In May 1976 the bankrupt and/or his wife had applied to the bank for a loan the proceeds of which were to be used to purchase the outstanding stock of the corporation which owned and published "The Racking Review". According to the testimony of the bankrupt, which was not controverted on this point, he suggested that the bank take as security for repayment of this loan a mortgage on the "Chalk Creek" farm. Apparently the loan was made and the bank secured its repayment with a deed of trust on this farm duly executed by the bankrupt and his wife as joint owners.

The president of the bank admitted that when the bankrupt returned the financial statement to him on or about November 1, 1977, he knew that the "Chalk Creek" farm was titled in the name of both the bankrupt and his wife, or at least had been at the time of the loan the previous year.

Did the bank renew these loans in reliance upon the financial statement as an indication that the bankrupt had a positive net worth and, if so, was such reliance reasonable and justifiable under the circumstances? As one bankruptcy judge has so aptly put it in another case where a creditor asserted that it had relied upon a false financial statement, "This creditor cannot assume the position of an ostrich with its head in the sand and ignore facts which were readily available to it." *In re Ducote*, 4 Bankr.Ct.Dec. 943, 945 (W.D.La.1978) (B.J.). Yet this apparently was just what occurred in this instance. No questions were asked concerning any of the information appearing in the statement. No search was made of any of the readily available public records to verify the status of title to the real property. From all indications the president of the bank merely accepted the representation of a positive net worth at face value and placed the statement in the bank's files.

■ Two decisions by the court of appeals for this circuit clearly indicate that the bank cannot be deemed to have reasonably and justifiably relied upon the financial statement for the purpose of obtaining relief under § 17a(2) of the Bankruptcy Act. In the earlier opinion, which is brief, that court upheld the finding of a referee that a finance company "did not rely upon the financial statements in question, having dealt with the bankrupt husband and wife for a period of five years with the result that the company knew, or should have known, the financial condition of the bankrupts." *Household Finance Corp. v. Groscost*, 230 F.2d 608, 609 (6th Cir. 1956). This same passage was quoted several years later when the court concluded that a creditor had not relied upon the written statements respecting financial condition as alleged since it had had previous financial dealings with the bankrupt from which it knew or should have known that the information contained in the statements was not accurate. *McDowell v. John Deere Industrial Equipment Co.*, 461 F.2d 48 (6th Cir. 1972). In this opinion the Sixth Circuit Court of Appeals also cited with approval the opinion by the ninth circuit in *Kentile Floors, Inc. v. Winham*, 440 F.2d 1128 (9th Cir. 1972), in which that court found the alleged reliance unjustified because the creditor, as a result of previous financial dealings, had sufficient knowledge of the bankrupt's affairs to put it on notice that further inquiry was required.

All three of these appellate cases involved objections to discharge, but the reliance element in § 14c(4) is the same as that required by the second clause of § 17a(2) and thus they are fully applicable to complaints seeking to have debts excepted from the discharge. An excellent discussion of the 1960 amendment which transferred the provision from § 14 to § 17 appears in a pertinent opinion involving a bank which also accepted an inaccurate financial statement in a *pro forma* manner as did the bank in the instant case. *Northwestern National Bank v. Halvorson*, 8 C.B.C. 1 (D.Minn.1976) (B.J.). The bankrupt had submitted to the bank an incomplete financial statement which did not reveal that his

most valuable asset, stock in a corporation, was pledged to secure a loan to another bank. The bankruptcy judge noted pertinently:

> Bankrupt's deceit, however, does not give rise to a conclusion that the Bank relied upon the misleading financial picture depicted in the March 22, 1974 statement. . . . In this instance, the loan officer accepted a statement which he knew was incomplete. If he were relying on this statement would not this fact ordinarily impel him to inquire further? Instead, without scrutiny, he accepted the statement in the manner of *pro forma* record keeping as though some type statement was necessary to complete his file. The mere acceptance of this cursory statement leads one to wonder what import the Bank itself ascribes to the form which it devised. One ponders the Bank's purpose in obtaining and accepting this statement. Was the Bank genuinely interested in obtaining a written statement of the bankrupt's financial condition, or was this statement requested and accepted for some other end? Certainly, the statement did not even approach fulfilling the former. Would this Bank have relied upon such a statement to extend $100,000.00 credit to a brand new applicant? This casual attitude, under these circumstances, however, may be understandable. . . . Their alternatives were to call in their loans . . . , or to extend them and hope . . . .

*Id.* at 16.

There are decisions to the effect that a creditor, at least a commercial lender, may not be deemed to have justifiably relied upon any representation contained in a financial statement which may be verified by reference to public records. *E. g., In re Ducote*, 4 Bankr.Ct.Dec. 943 (W.D.La.1978) (B.J.); *In re Hcdges*, 6 C.B.C. 65 (S.D.Fla. 1975) (B.J.). It is not necessary in this instance to decide whether such a rule should be applied in this court, the bank's president having had actual knowledge that title to the "Chalk Creek" farm was vested in the bankrupt and his wife a year and a half prior to the delivery of the financial statement. This was sufficient to put him on inquiry to determine whether there had been the change in title that the bankrupt's financial statement indicated.

As the foregoing cases indicate, where there has been a previous financial relationship between a creditor and a bankrupt, it is difficult for a creditor to show that it did in fact rely on the financial statement in extending credit, or if it did rely on the statement, that it was justified in doing so in the light of information it may have obtained previously.

This court is as puzzled by the bank's action in this case as was the court in *Halvorson* and can only speculate that the bank renewed the loans, which were essentially unsecured, in the hope that ultimately the Yeiser family, with whom it apparently had had a good relationship for many years, would see to it that the debts were paid. The bankrupt explained his reason for completing the financial statement the way he did by stating that he just assumed that whatever his wife owned he owned. It may well be that the bank president viewed the financial statement in the same light, looking to family assets in the hope that the family, although not legally obligated, would nevertheless pay.

■ The court has not addressed the issue of whether the bank has proved another element required for relief under § 17a(2)— that the bankrupt prepared and delivered the financial statement to the bank with the requisite intent to deceive. As the foregoing cases indicate, even if the bankrupt intended to deceive, the bank nevertheless would not be entitled to relief if it did not justifiably rely on the financial statement.

An appropriate order will be entered.