**In re Virginia Ann FURIMSKY, Debtor.**

**W.A.F.B. FEDERAL CREDIT UNION, Plaintiff,**

v.

**Virginia Ann FURIMSKY, a single person, Defendant.**

**Bankruptcy No. B-81-3025-PHX-GBN. Adv. No. 82-584-GBN.**

United States Bankruptcy Court, D. Arizona.

May 9, 1984.

See also, Bkrtcy., 41 B.R. 724.

Conway T. Ryan, Law Offices of Conway T. Ryan, P.C., Chandler, Ariz., for debtor/defendant.

Howard M. Snyder, Snyder & Robens, Phoenix, Ariz., for plaintiff.

## MEMORANDUM OF DECISION

GEORGE B. NIELSEN, Jr., Bankruptcy Judge.

The plaintiff institution seeks a determination that a revolving loan in the amount of $4,500.00 is nondischargeable under the Code. 11 U.S.C. § 523(a)(2)(B).

## FINDINGS OF FACT

The facts necessary for a determination of the issues are as follows:

Debtor Virginia Ann Furimsky has been a member of the Williams Air Force Base Federal Credit Union since 1975 or 1976 due to her employment as a receptionist at the Base hospital. Her biweekly income in June of 1981 was $392.00 plus a $200.00 monthly rent payment from her son James,

who has since moved. In that month, her automobile urgently needed repairs. James agreed to fix the vehicle if she could obtain financing for the parts.

She approached Loan Supervisor Kent M. Smith at the credit union on June 16, 1981. She knew Mr. Smith from prior dealings at the institution, including the conversion of her automobile loan into a monthly payment account in November of 1980.

They discussed her needs and on that date Ms. Furimsky signed and dated a blank revolving credit plan application. Plaintiff's Exhibit 3. She testified she was instructed to bring the completed credit history back the following day and pick up her check.

Ms. Furimsky knew she was to list all her creditors and assumed Supervisor Smith would review it in regard to her income and debts. She intended that the institution rely on her application. On June 16, 1981, Mr. Smith could only have known her debts and income through her prior applications, which were not in his office.

Debtor took the credit application home but did not read it carefully. She knew she was to include all her debts and concedes she failed to do so. Plaintiff's Exhibit 5. In the 10 to 15 minutes she took to complete the application, debtor failed to list a $4,700.00 obligation owed to Attorney Larry Richmond, a $160.00 debt to Joseph Blech, M.D., or a loan from Dial Finance.

Ms. Furimsky completed the application "off the top of her head" and did not consult any records to verify the amounts for the three creditors she did list. She is unsure if even the listed debts are correct.[1]

She could have simply called these creditors and obtained the correct amounts.

On the same evening she completed the application, she also wrote monthly checks to certain creditors, including those not listed on the application. Both Dr. Blech and Attorney Richmond were written $5.00 checks on their accounts that evening. Plaintiff's Exhibits 8 and 12.

Ms. Furimsky knew her prior applications had not been questioned.[2] Debtor omitted the three debts because there was no heading specifically requesting a listing for these types of debts, there was a lack of room on the form for them and she had previously left off debts on prior applications without being questioned.

She called Mr. Smith on June 17 and told him she would return that morning to pick up her check. She spoke briefly to Mr. Smith at the credit union, submitted the application and received her check. She did not inquire why the application had no specific headings or room to list finance company loans or attorney fees.

The unsecured loan transaction was structured to pay off two existing loans and provide $1,160.00 in cash. Plaintiff's Exhibits 4, 17, 18, 21 and 23.

Following her brief June 17 conversation with Mr. Smith, debtor deposited the check into her bank account and went to lunch with her friend Deborah K. Swaney.[3]

Mr. Smith, a nine-year credit union employee, was the loan supervisor for the Base branch at the time. In 1981, credit union policy changed; loan officers were required to compute a percentage point debt ratio by comparing an applicant's net income and expenses.

---

1. It appears they are not. Checks written the same night to listed creditors J.C. Penney, Alden's and Diamonds all reflect monthly payments higher than listed on the application. *Cf.* Exhibit 5 with Exhibits 9–11.

2. Debtor filled out approximately ten loan applications from the period 1975–1976 to the present. The form of the questioned application is different from the prior papers. *Cf.* Exhibit 5 with Exhibits 20, 23.

3. Ms. Swaney supports debtor's testimony the loan was initially approved on June 16, 1981, thereby establishing no reliance on the June 17, 1981 financial application. The testimony of Mr. Smith and all credit union documents reflect there was no enforceable loan contract until June 17. Exhibits 3, 4, 17–19.

Ms. Furimsky's debt ratio was 45%, based on her disclosed income. Prior to receiving debtor's financial statement, Mr. Smith could not complete the debt ratio since he would not know her debt amounts. He testified he asked if she had listed all debts and was told, "Yes." Based on her loan application, Mr. Smith calculated debtor's debt ratio as 37%. Exhibit 18. The undisclosed debts would raise her ratio to 60%, which was beyond his authority to loan without further approval.

Mr. Smith cannot recall if Ms. Swaney was present at the two meetings, if debtor filled out the application in his office or at home, how long debtor was in his office on June 16 and 17 or how long it took to disburse the loan.

Existing loan policy required that an applicant's credit history be verified by a credit reporting service or individual rating. Defendant's Exhibit 11, at ¶ I–D. There was to be no exception to this policy. *Supra*, at ¶ I–F.

In compliance with this policy, Mr. Smith contacted Credit Data of Arizona through the institution's Mesa office. The report was delivered on June 17 and Mr. Smith did not approve the loan until after he reviewed the credit report. Because this document had not previously been introduced or exchanged,[4] I directed Mr. Smith to produce a copy and had it entered into evidence. Court Exhibit 1.

The report lists a Dial Finance debt of $2,726.00, which was not reflected in the loan application. *Supra.* Mr. Smith does not recall why he did not ask debtor about this omitted debt or contact Dial Finance for further information.

### CONCLUSIONS OF LAW

■ Debts for obtaining money through the use of a false financial statement are within a category of debts which can be held nondischargeable in bankruptcy.

Plaintiff's cause of action consists of five elements:

(1) a statement in writing,

(2) that is materially false,

(3) respecting the debtor's or an insider's financial condition,

(4) on which the creditor reasonably relied, and

(5) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).

A creditor must prove all five elements by clear and convincing evidence before a debt is excepted from discharge. *In re Duncan*, 35 B.R. 323, 324 (Bkrtcy.W.D.Ky. 1983); *In re Winfree*, 34 B.R. 879, 882 (Bkrtcy.M.D.Tenn.1983).

■ Exceptions to discharge are strictly construed in favor of the debtor. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Matter of Cross*, 666 F.2d 873, 879–80 (5th Cir.1982).

One of the few changes in § 523(a)(2) from § 17(a)(2) of the prior Act is the addition of the word "reasonable" to the requirement of creditor reliance. H.R. No. 95–595, Cong. 1st Sess. 364 (1977), U.S. Code Cong. & Admin.News 1978, p. 5787. Congress was cognizant of creditors who would induce false financial statements on which they would not rely but would utilize to threaten litigation if the debtor subsequently filed bankruptcy. *Supra*, at 130–31. The requirement of reasonable reliance hopefully makes such abuse less likely. *In re Futterman*, 35 B.R. 102, 104 (Bkrtcy.D.Conn.1983), *citing In re Fosco, Jr.*, 14 B.R. 918, 921 (Bkrtcy.D.Conn.1981).

■ A creditor must not only prove reliance upon a debtor's financial statement but also that the reliance was reasonable. *Matter of Patch*, 24 B.R. 563, 565 (D.Md. 1982); *In re Futterman*, 35 B.R., at 104; *In re Winfree*, 34 B.R., at 884.

There are several situations in which a lack of creditor reliance has been shown.

---

4. Defendant charges the document was improperly withheld from discovery. Defendant's Post-

Hearing Brief, at 30–32. Docket No. 60.

The first is where the creditor knows at the onset the financial information is not accurate; another is where the creditor's investigation suggests the financial statement is false or incomplete. *Patch*, 24 B.R., at 566; *Futterman*, 35 B.R. at 104, and cases cited.

Both elements are present here. Prior to approving the loan, the officer had a credit report indicating debtor had omitted a $2,726.000 obligation.

Thus, the institution knew at the onset, through its independent investigation, the financial statement was incomplete or inaccurate with respect to the debtor's liabilities. Under these circumstances, it was unreasonable for the credit union to rely on the financial statement—if indeed it did.[5]

At the very least, plaintiff should have attempted to verify the discrepancy between the liabilities listed in debtor's statement and the credit report. Plaintiff's officer was unable to state why he did not question Ms. Furimsky about the Dial Finance debt, much less call that undisclosed creditor himself to ascertain the status of that large debt.

As several courts have observed:

"This creditor cannot assume the position of an ostrich with its head in the sand and ignore facts which were readily available to it." ... Yet this apparently was just what occurred in this instance. No questions were asked concerning any of the information appearing in the statement.... From all indications the president of the bank merely accepted the representation of a positive net worth at face value and placed the statement in the bank's files....

*In re Futterman*, 35 B.R., at 105, *citing In re Yeiser*, 2 B.R. 98, 101 (Bkrtcy.M.D.Tenn. 1979). *See also In re Ducote*, 4 B.C.D. 943, 945 (Bkrtcy.W.D.La.1978).

■ Clearly, if the credit check had revealed no inconsistencies with debtor's financial statement, then the creditor's reliance would be deemed reasonable. *In re*

*Ardelean*, 28 B.R. 299, 301–02 (Bkrtcy.N. D.Ill.1983). The opposite conclusion obtains when the creditor knows or should know the statement is inaccurate or incomplete. *In re Duncan*, 35 B.R., at 325.

Both counsel have been diligent in citing cases supporting their positions on the reliance issue. Controlling Ninth Circuit authority seems lacking. Clearly, whatever I decide can be supported by case law. The trick is to do justice.

■ Plaintiff urges a series of Seventh Circuit decisions which seem to hold virtually any reliance is sufficient to establish nondischargeability. I doubt this approach squares with the Ninth Circuit's policy of imposing a "weighty burden" on creditors and strictly construing exceptions to discharge to effectuate the congressional policy of permitting debtor a fresh start. *In re Rahm*, 641 F.2d 755, 756–57 (9th Cir. 1981); *Matter of Kasler*, 611 F.2d 308, 310 (9th Cir.1979); *In re Houtman*, 568 F.2d 651, 656 (9th Cir.1978), all *citing Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915). The section prohibiting discharge for false representations and a false financial statement is subject to the same rule of strict, literal construction governing all other exceptions to discharge. *In re Taylor*, 514 F.2d 1370, 1373 (9th Cir.1975).

Accordingly, I suspect the Ninth Circuit approach would be to join these courts critical of the Seventh Circuit's handling of "reasonable reliance":

Shortly after the enactment of the Code, the Seventh Circuit outlined a stringently pro-creditor standard in *Matter of Garman*, 643 F.2d 1252 (7th Cir. 1980). It held that reasonable reliance was lacking when a creditor's reliance on the financial statement would be *so* unreasonable as not to be actual reliance at all." In other words, virtually *any* reliance is enough.

We derive little assistance from *Garman*. Its tautological quality does not

---

5. Certainly, Supervisor Smith testified he did "rely" on the false financial statement. This is not dispositive. *See* unpublished bankruptcy

Order 79–60904 cited in *In re Kreps*, 700 F.2d 372, 375 (7th Cir.1983).

facilitate an analysis of what constitutes "reasonable" reliance, nor is it easily reconcilable with Congress' intent to have courts consider reliance as an independent requirement among the components which, taken together, comprise actionable misrepresentation. *Actual* reliance and *reasonable* reliance are distinguishable phenomena, and we cannot pretend otherwise.

Later courts have departed from the simplicity of the *Garman* standard. Categories of "unreasonable reliance," based on the facts surrounding the commercial transaction, have been judicially fashioned. At least four such classifications have emerged, involving cases where: (1) the creditor knows that the financial information is not accurate; (2) the statement contains obviously inadequate financial information; (3) the creditor's investigation of the statement suggests its falsity or incompleteness; and (4) the creditor fails to verify information on the statement.

Relief is denied in such cases. Creditors who rely on financial statements in these circumstances are considered as having acted "unreasonably," and have not prevailed in § 523(a)(2)(B) challenges.

*In re Duncan*, 35 B.R., at 325 (footnote omitted, emphasis in original). *See also Matter of Patch*, 24 B.R., at 565–66.

■ An emerging standard to determine whether the creditor's reliance is reasonable is to compare the creditor's actual conduct to the creditor's own business practices and standards. *In re Ardelean*, 28 B.R., at 30.

Plaintiff has a mandatory policy requiring loan officers to verify every credit application by, *inter alia* a credit reporting service. Defendant's Exhibit 11 ¶ I–D. There are no exceptions to this requirement. ¶ I–F, *supra*. Such a rule is good banking policy but severely undercuts claims the institution "relies" on submitted financial statements.

Clearly, this business practice contemplates that the officer not only order the independent credit report but actually read and compare it to the debtor's written statement. That apparently was not done here.

"A creditor who ignores available information, or who fails to seek information from sources that are commonly used, should not be heard to complain about the debtor's fraud. It is the creditor's failing to comport with normal business practices, not the debtor's fraud, that is the true cause of the loss."

*In re Duncan*, 35 B.R., at 326; *Matter of Ebbin*, 32 B.R. 936, 942 (Bkrtcy.S.D.N.Y. 1983); Zaretsky, *The Fraud Exception to Discharge Under the New Bankruptcy Code*, 52 AM.B.L.J. 253, 261–62 (1979).

Plaintiff opines that even if the officer had contacted Dial Finance and determined the amount of debtor's monthly payment, this additional figure would not raise the debt-ratio figure sufficiently to deny the loan. This misses the point. The credit union had information before it indicating debtor's financial statement was inaccurate. It did nothing with that information. This is hardly reasonable reliance. 11 U.S.C. § 523(a)(2)(B)(iii). *Contra, In re Anderson*, 10 B.R. 607, 608 (Bkrtcy.S.D. Fla.1981).

■ The standard to be employed in determining the reasonableness of reliance under § 523(a)(2)(A) depends in part on the relative sophistication of the parties, nature of the representations and the ease of conducting an investigation. *Matter of Bisbach*, 36 B.R. 350, 353 (Bkrtcy.W.D.Wis. 1984).

Here, the officer was a nine year credit union supervisory employee, whose responsibility it was to review loan applications. He had merely to compare the credit bureau report on his desk with debtor's financial statement to observe the inconsistency. He had merely to ask the debtor about the inconsistency to investigate it. This was not done.

I do not wish to be misunderstood. I am not ruling the debtor's conduct here was either blameless or excusable. It is not a lender's responsibility to search out fraud

in a financial statement. However, when evidence does come to it indicating the inaccuracy or incompleteness of such a document, the creditor errs by failing to even interrogate the debtor about the inconsistency.

 Construing exceptions to discharge strictly in favor of the debtor as required, I find plaintiff has not shown by clear and convincing evidence it reasonably relied on debtor's written financial statement. 11 U.S.C. § 523(a)(2)(B)(iii). Plaintiff's complaint and cause of action are dismissed. Pursuant to Rule 7052, *F.Bk.R.*, this memorandum constitutes my findings and conclusions.