In re Paul R. SCHEER, Debtor.

FLORENCE SAVINGS BANK, Plaintiff,

v.

Paul R. SCHEER, Defendant.

Bankruptcy No. 91 B 20902.
No. 91 Adv. 6207.

United States Bankruptcy Court,
S.D. New York.

June 12, 1992.

Murray S. Lubitz & Associates, White Plains, N.Y., for Florence Sav. Bank.

Fink Weinberger, P.C., White Plains, N.Y., for debtor.

## DECISION ON COMPLAINT TO DETERMINE DISCHARGE-ABILITY OF DEBT

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

The parties in this nondischargeability controversy have presented diametrically opposite versions as to which day the debtor delivered written financial statements for a loan which was granted on the morning of March 7, 1989. The debtor, Paul R. Scheer, contends that the statements could not have been relied on by the creditor bank, Florence Savings Bank ("the Bank") in granting the loan because they were delivered in the afternoon of March 7, 1989, after the loan had been granted. The Bank maintains that the statements were delivered in the late afternoon of March 6, 1989, and that they were relied on in granting the loan the next morning. The Bank also claims that the personal financial statement as to the debtor's financial condition was materially false. There are enough interesting little clues in this mystery to satisfy the appetite of Sherlock Holmes or activate the little grey cells of Hercule Poirot.

The Bank, located in Northampton, Massachusetts, objects to the dischargeability of its claim against the Chapter 7 debtor, Paul M. Scheer, in connection with his written guaranty of the obligations of his corporation, the Hampshire Dealer Group, Inc. ("Hampshire"), a franchised automobile

dealer in Northampton, Massachusetts. The Bank's complaint is based upon 11 U.S.C. § 523(a)(2)(B). The Bank alleges that it advanced a $250,000.00 loan to Hampshire on the basis of a materially false statement in writing respecting the financial condition of the debtor on which the Bank reasonably relied. The debtor denies, among other things, that the written statement was materially false and that the Bank reasonably relied on it.

The loan in question was made by the Bank to Hampshire on March 7, 1989. One of the key issues is whether the debtor and Alan Kalish, the other principal of Hampshire, ever visited the Bank's premises on March 6, 1989 to deliver the written financial statements in question to the Bank, as alleged by the Bank. The debtor asserts that the Bank never relied on the financial statements which he delivered to the Bank because he delivered them on March 7, 1989, after the Bank made the $250,000.00 loan to Hampshire, and not on March 6, 1989, as claimed by the Bank.

The debtor contends that Hampshire's financial standing was well-known to the commercial enterprises in Northampton as a prosperous automobile business with annual sales in excess of $41 million. Additionally, Hampshire's business reputation was familiar to the Bank because the Bank routinely purchased Hampshire's commercial notes. The debtor asserts that his business associate, Alan Kalish, was a local personality in Northampton and enjoyed a favorable reputation as a successful businessman. Hence the debtor maintains that the Bank's loan to Hampshire was based on Hampshire's positive business reputation and was not made in reliance on the financial statements which the debtor and Kalish delivered to the Bank as a mere formality. The debtor bottoms this argument on the fact that no formal written loan application was sought by the Bank as a condition for approval of the loan. Additionally, the debtor contends that even if the court were to accept the Bank's position that the financial statements were delivered late in the afternoon on March 6, 1989, which the debtor denies, the Bank made the loan the next morning on March 7, 1989 and issued the check for $250,000.00 by noon of that day. This sequence of events did not allow any time to investigate or digest the information contained in the financial statements.

Significantly, the Bank does not claim that the financial statement which the debtor submitted as to his corporation's financial condition was false or incorrect. The complaint alleges that the debtor's personal financial statement, which he delivered in support of his guaranty of his corporation's obligation under the loan, was materially false.

### FINDINGS OF FACT

1. The debtor, Paul R. Scheer, filed a voluntary petition with this court on June 14, 1991 for relief under Chapter 7 of the Bankruptcy Code. Pursuant to 11 U.S.C. § 301, the filing of a voluntary Chapter 7 case constitutes an order for relief.

2. The plaintiff Bank is a Massachusetts banking corporation organized and having a principal place of business in Northampton, Massachusetts.

3. The debtor had been a shareholder and the treasurer of Hampshire, a corporation engaged in the sale of automobiles in Northampton, Massachusetts through various affiliated entities, including Northampton Lincoln–Mercury, Inc., Hampshire Toyota, Inc., Hampshire BMW, Inc. and Hampshire Volkswagen, Inc. Alan Kalish was also a principal of Hampshire, both as a shareholder and its president.

4. Alan Kalish and Hampshire were well-known in Northampton, Massachusetts because of their substantial business activities in the automobile business. The Bank's senior loan officer, Robert Koch, testified that Alan Kalish was a "local personality" in Northampton.

5. The Bank was also familiar with Hampshire and its activities because the Bank routinely purchased Hampshire's commercial notes each month.

6. Shortly before March 7, 1989, Alan Kalish, as President of Hampshire, contacted Mr. Koch and informed him that Hamp-

shire would like to request a $500,000.00 loan from the Bank. Kalish told Koch that the reason for the loan was to reduce Hampshire's existing floor plan obligations to the Bank of New England ("BONE"). Koch thought that it was unusual for a business to seek one bank loan in order to pay down another bank loan. Koch reflected this request in his pink sheet diary dated March 14, 1989, as follows: "the loan proceeds are being used to reduce a floor plan line of credit of BONE." Trial Exhibit A.

7. Neither Hampshire, Kalish, nor the debtor ever submitted a written request for a loan from the Bank. No written loan application form was ever used as a basis for the loan in question.

8. Irene David, a retired loan officer of the Bank, testified that on the morning of March 7, 1989, Koch asked her to call Kalish and the debtor at Hampshire's office and to have them come in at noon and close the loan. When Kalish and the debtor came to the Bank at noon, Ms. David had them each sign a personal guaranty form and the promissory note evidencing a $250,-000.00 loan. She assumed that the Bank had in its records a loan file documenting this transaction. No evidence was presented as to any such loan file. After Kalish and the debtor signed the guaranties and the note, Ms. David gave them a check payable to Hampshire in the sum of $250,-000.00 in accordance with the approved loan.

9. Stacey Reinke, who was a secretary and receptionist at the Bank in March of 1989, testified that the debtor and Kalish came to the Bank late Monday afternoon, March 6, 1989, and left with her a manila envelope to be given to Mr. Koch, the Bank's senior loan officer. She said that Mr. Koch had left the bank earlier that afternoon and that she put the envelope on Koch's desk. She also testified that her normal working day included leaving the Bank between 4:30 and 5:00 p.m. each day. Thus, in order for the debtor to have been in the Bank on March 6, 1989 to give Ms. Reinke an envelope, it must have been before 5:00 p.m.

10. Alfred E. Drapeau, another loan officer at the Bank, testified that he remembered seeing Kalish and the debtor comes in to the bank on March 6, 1989. He produced no documents or diary to support his belief that the date was March 6, 1989 rather than March 7, 1989, was testified to by the debtor.

11. Robert Koch, the Bank's vice president and senior loan officer, testified that Hampshire's Alan Kalish was known to him as a local business man and "a local personality." Additionally, the Bank had routinely purchased Hampshire's commercial notes. However, Hampshire did its banking with institutions other than Koch's Bank. Koch's loan authority could not exceed $100,000.00. Koch said that on March 3, 1989, he became aware that Alan Kalish would like to borrow from the Bank $500,-000.00 on behalf of Hampshire and that Kalish might come in to see Koch about this loan.

12. Koch testified that on March 6, 1989 Kalish and the debtor came in to the Bank early in the day to discuss with Koch the possibility of obtaining a $500,000.00 loan for Hampshire. Koch was told that the loan was needed to reduce Hampshire's floor plan obligation to BONE. Koch admitted that this was an unusual request, namely to borrow from one bank to pay down another bank.

13. Koch said he informed Kalish and the debtor that the Bank would require financial information as to Hampshire, corporate authorization from Hampshire and personal guaranties of Kalish and the debtor. Koch then left the Bank later that day and told the receptionist in the loan department, Stacey Reinke, that Kalish and the debtor would return to the bank that day and deliver documents to support their loan request.

14. Ms. Reinke testified that later that afternoon, on March 6, 1989, Kalish and the debtor dropped off a manila envelope with her, which she put on Koch's desk in his absence.

15. Koch testified that he returned to the Bank that evening and reviewed the financial statements in the manila envelope

on his desk. He reviewed the Hampshire statement, dated as of January 31, 1989, which reflected total assets of $14,099,-425.00, total liabilities of $9,498,638.00 and stockholders' equity of $4,600,814.00. Trial Exhibit D. Koch also reviewed a consolidated balance sheet and statement of income for Hampshire for the year ended June 30, 1988 (9 months before the March 7, 1989 loan) which reflected net sales of $41,473,968.00 and net income after taxes of $615,467.00. Trial Exhibit 7. The bottom of this document contained a legend which read: "DRAFT—TENTATIVE AND PRELIMINARY FOR DISCUSSION AND INTERNAL PURPOSES ONLY—SUBJECT TO REVIEW." Koch also said he reviewed the debtor's personal financial statement which reflected a net worth of $3,588,000.00. Trial Exhibit 6.

16. Based upon the foregoing financial statements, Koch said he concluded that Hampshire, the debtor and Kalish had substantial net worth figures. He said he then filled in a printed offering statement, dated March 6, 1989, which stated the amount of the loan as $250,000.00, although the request was for $500,000.00. Trial Exhibit 4. The form states that the loan was approved by Koch and Mr. Morin, who was the president of the Bank. Adjacent to the approved legend there is a date noted as "3/14/89." The purpose for the loan is stated as: "Short term working capital." However, Koch admitted that the loan request was for the purpose of paying down the BONE floor plan obligation. Adjacent to the caption for REMARKS is a statement which reads: "BONE–WEST *3/7/89 Verified* 04–2950855 Hampshire Dealer Group, Inc. Date of Organization 2/13/87. This Agent, client: Alan Kalish." *Id.* (emphasis added).

17. Koch testified that on Tuesday morning, March 7, 1989, he met with the Bank's president, Mr. Morin and informed the latter that he was not comfortable with the loan request and recommended to Morin that the loan amount should be lowered to $250,000.00. Morin suggested that Koch reconsider approving the original $500,-000.00 request. Apparently, the Bank's president was anxious to begin a banking relationship with Hampshire.

18. The Bank's Board of Investment met at 8:30 a.m. on March 7, 1989. Koch presented the Hampshire loan request to the Board. He informed the Board that Kalish and the debtor came to the bank the previous day to request the loan. Koch was authorized to proceed with the loan after getting a favorable response from BONE. This information is reflected in the minutes of the Board of Investment for March 7, 1989 as follows:

Koch advised the Board that he and Edward Morin are in receipt of a loan request from the Hampshire Dealer Group. Alan Kalish and Paul Scherer (sic) came to the bank yesterday to make the request. Koch and Morin are recommending a loan of $250,000. The loan would be on demand for a period of six (6) months. Koch states the business seems to be doing well. Eric Stahlberg asked what the net worth of the business was. Koch stated that the Hampshire Dealer Group has Total Assets of some $17,000,-000. with offsetting liabilities of about $13,600,000. Total net worth is $4,200,-000. Koch also stated that sales for the dealership for year ending June 30, 1988 was $41,000,000. with net income of $615,000. Koch also stated that both Scherer (sic) and Kalish have personal net worths in the area of $3,000,000. each. Koch stated he had been trying to reach the Bank of New England prior to the meeting to obtain credit information. He has not been able to talk to anyone for information, has left a message at the bank for them to call us. The use of *the money will be for working capital* as there is an excessive used car inventory left over from a mild winter. The Board authorized Koch and Morin to proceed with the loan after getting a favorable response from the Bank of New England.

Trial Exhibit E, Minutes of Board of Investment for March 7, 1989 (emphasis added).

19. It is apparent that the Board of Investment was not informed that the

Hampshire loan request was for the purpose of paying down Hampshire's floor plan obligation to BONE, but for "working capital." This mysterious clue must be compared with the offering statement, Trial Exhibit 4, which Koch prepared and which also stated that the purpose for the loan was "short term working capital." This raises the question as to why Koch would advise the Bank's Board of Investment that the loan was for working capital when he was fully aware that the requested purpose was to pay down Hampshire's obligation to another bank. Perhaps the fact that Koch and Morin were eager to commence a banking relationship with Hampshire might explain why this admittedly unusual transaction was disguised as a working capital loan.

20. Apparently after the March 7, 1989 Board of Investment meeting, Koch did get a favorable response from BONE as to Hampshire's financial condition because this fact is reflected in the Board's minutes for the meeting held on March 14, 1989. Trial Exhibit 11. The minutes state in relevant part that the loan was then approved by the Board on March 14, 1989, after hearing from BONE that "the relationship is satisfactory."

> Robert Koch informed the Board that he received a request from the Hampshire Dealer Group Inc. for a loan in the amount of $500,000. for six months. He discussed the request with Edward Morin and they both agreed to offer them a loan of $250,000., on demand, prime plus 1½%, to be endorsed by Alan Kalish and Paul Scherer [sic]. Koch reported that he talked with Bank of New England and *the relationship is satisfactory*. A motion was made *that the request be approved*, seconded and so voted. Koch explained that the Hampshire Group currently has an overabundance of used cars and this loan is needed to reduce his Line of Credit for purchasing new inventory.

Trial Exhibit O, Minutes of Board of Investment for March 14, 1992 (emphasis added).

21. Despite the fact that the Bank's Board of Investment did not approve the Hampshire loan until March 14, 1989, Koch authorized the bank's loan officer, Irene David, to issue the $250,000.00 loan to Hampshire on March 7, 1989, after Kalish and the debtor signed the promissory note for $250,000.00 and also signed written personal guaranties with respect to this loan.

22. In addition to the discrepancy as to the approval date for the loan, there also exists the inconsistency between the fact that the loan was requested to pay down the BONE debt, whereas the Bank's Board of Investment was told that the loan was for Hampshire's working capital. These inconsistencies tend to cast doubt on whether or not Kalish and the debtor actually came to the Bank twice on March 6, 1989, as suggested by the Bank's proof. The first visit on March 6, 1987 was allegedly for the purpose of requesting the loan. The second visit was said to have been a return trip in the afternoon to drop off the financial statements for Hampshire, Kalish and the debtor. According to the debtor's testimony, neither he nor Kalish visited the Bank on March 6, 1989, even once.

23. According to the debtor's testimony, Kalish had telephoned Koch on March 6, 1989 and gave him oral information as to Hampshire's figures. Kalish did not have any financial information available to him as to the debtor's personal financial condition.

24. The debtor testified that he was notified by Kalish at 11:00 a.m. on March 7, 1989 that the Bank approved a $250,000.00 loan to Hampshire and that they had to be at the Bank at 12:00 noon to deliver financial statements as to Hampshire and personal financial statements as to themselves. He further testified that he brought with him a photocopy of his personal financial statement which originally had previously been submitted to another bank, and which was dated as of January 31, 1989. Trial Exhibit 6.

25. The debtor produced convincing evidence that he could not have visited the Bank in Northampton, Massachusetts to deliver financial statements to the loan de-

partment's receptionist, Stacey Reinke, before she quit work between 4:30 and 5:00 p.m. on March 6, 1989. The debtor's proof established that he was in New York most of the day on March 6, 1989.

26. Eileen Potash, an attorney with an office in New York City on March 6, 1989, testified that the debtor visited her office at 11:00 a.m. that day for the purpose of preparing for a deposition in an unrelated real estate broker's commission litigation. The debtor left her office about noon.

27. George M. De Martino, a manufacturer in New York, testified that he had a scheduled appointment to meet with the debtor at 1:30 p.m. on March 6, 1989 at a diner in Yonkers, New York to discuss a proposed factoring contract that his company was considering. De Martino had been an accounting client of the debtor, who is a certified public accountant, and whose advice was sought in connection with the proposed factoring arrangement. De Martino testified that he had lunch, although the debtor did not eat at the diner. According to De Martino's testimony, the meeting lasted about one hour, at which time they left the diner at approximately 2:30 p.m. It does not take a Sherlock Holmes or a Hercule Poirot to conclude that the debtor could not drive in his car from Yonkers, New York to Northampton, Massachusetts after 2:30 p.m. in time to deliver financial statements in a manila envelope to Stacey Reinke before she quit work between 4:30 and 5:00 p.m. that day. Indeed, the debtor testified that he then drove directly to his home in Longmeadow, Massachusetts.

28. The Bank's version of the events on March 6, 1989 is far-fetched in light of Koch's testimony that both Kalish and the debtor came into the Bank early in the day to discuss the possibility of a loan to Hampshire and that they were told to return later that day with financial information. Clearly, this testimony is incorrect because the debtor was in New York that day, meeting with attorney Potash and businessman De Martino, at least until 2:30 p.m.

29. In view of the fact that Ms. Reinke testified that Koch was not present in the Bank during the afternoon of March 6, 1989 and had asked her to put the papers on his desk, which Kalish and the debtor were supposed to return with in the afternoon, it follows that Koch could not have met with the debtor on March 6, 1989, as he testified. The debtor was in New York until at least 2:30 p.m. that day and could not have met with Koch in the morning or early afternoon. Koch was not in the Bank in the afternoon and Ms. Reinke quit work before the debtor could have conceivably travelled from New York to deliver financial papers to her on March 6, 1989.

30. The debtor testified that he had never met Koch before the loan was extended to Hampshire. Kalish knew Koch and had telephoned the financial information about Hampshire to Koch on March 6, 1989, when he requested the loan. The debtor said that he was introduced to Koch by Kalish when they accidentally met in a local restaurant shortly after the loan was made on March 7, 1989.

31. This factual scenario is more consistent with the conclusion that Kalish and the debtor delivered to the Bank the financial statements in question on March 7, 1989 when they admittedly came in to sign the Hampshire promissory note and their personal guaranties in exchange for their receiving a $250,000.00 loan from the Bank.

32. Based on the foregoing, it must be found that the Bank has not established by a preponderance of the evidence that it reasonably relied on the personal financial statement of the debtor before it extended credit to Hampshire. Indeed, his personal financial statement was a mere formality for the Bank's file because it extended the $250,000.00 loan to Hampshire for the reason expressed on page 4 in Koch's pink sheet diary: "The Bank serviced the loan request because we had knowledge of Kalish and a long history in Northampton." Trial Exhibit A.

33. The Bank's hurry to extend the loan and to open a business relationship with Hampshire is reflected by the fact that no written loan application was requested and the loan was made on the same day that Koch presented the request to the Bank's

Board of Investment, despite the fact that the Board did not formally approve the loan until one week later, on March 14, 1989. No credit can be given to the testimony that both Kalish and the debtor visited the Bank twice on March 6, 1989 and that the second visit was for the purpose of delivering the financial statements on which the Bank allegedly relied before it issued the $250,000.00 check the next day. This testimony is undermined by the convincing evidence that the debtor was in New York on March 6, 1989 and that he first left Yonkers, New York after 2:30 p.m. that day.

34. There was no evidence introduced to question the correctness of the figures contained in the financial statements with respect to Hampshire's operations. The Bank does not contend, nor can it be found, that Hampshire's financial statements were false in any respect.

35. The photocopy of the debtor's personal financial statement as of January 31, 1989, which was signed and dated February 8, 1989 was materially false. *See* Trial Exhibit 6. It omitted a $300,000.00 mortgage recorded in favor of the debtor's deceased father. It failed to reflect that the debtor's home, valued at $475,000.00, was jointly owned with his wife. It failed to state that one of the debtor's automobiles, valued at $60,000.00, was leased and not owned outright by the debtor, while the other car was owned by the debtor's wife or daughter. The statement failed to note that the item for personal jewelry, furs, etc. in the sum of $100,000.00 should have reflected that the debtor's wife owned approximately 60% of the items. There were other assets listed in the debtor's personal financial statement which were questionable as to value, although accurate as to the face amount. Thus, notes due from another business associate in the sum of $250,-000.00 and second and third mortgages held for investment in the principal amount of $160,000.00 were either valueless or shortly thereafter had zero value. An inventory of gold, diamonds and precious stones, valued at $400,000.00 in the debtor's financial statement was sold by him in July of 1989 for $45,000.00.

36. As a certified public accountant, the debtor is charged with the knowledge that the photocopy of the financial statement which he delivered to the Bank on March 7, 1989 was materially false in that it did not accurately reveal the debtor's true financial condition on March 7, 1989. As a certified public accountant, the debtor knew that stale figures had to be updated in March of 1989 before the information could be relied on by the Bank as one of the factors to be considered in connection with Hampshire's loan request.

37. The issue as to the falsity of the debtor's personal financial statement is academic in light of the finding that the Bank did not prove by a preponderance of the evidence that it relied on his financial statement in making the $250,000.00 loan to Hampshire.

38. The Hampshire loan was never repaid. Hampshire made two interest payments and defaulted in making any further payments to the Bank.

## DISCUSSION

Robert Koch testified that in hindsight the Bank should not have made the $250,-000.00 loan to Hampshire. Manifestly, hindsight is better than foresight by a darnsight. The testimony that both Kalish and the debtor, as principals of Hampshire, came to the Bank on March 6, 1989 and returned again that afternoon with financial statements which they delivered to the receptionist in the Bank's loan department, appears to be based on hindsight because the loan was made at noon on March 7, 1989. The Bank did not have the foresight to wait and not rush to execute the loan before it had time to analyze and digest the financial statements which the debtor and Kalish delivered to the Bank on March 7, 1989 and which were put on Koch's desk to be reviewed when he returned to the Bank.

Although there was no proof that Hampshire's financial statements were false, the Bank cannot be heard to say that it also reasonably relied on the debtor's materially false personal financial statement when it chose to rely on the favorable local reputa-

tions of Hampshire and Kalish. The Bank regularly purchased Hampshire's commercial notes and wanted to make the requested loan to Hampshire in order to commence a banking relationship with the locally well-known automobile dealership.

■■■ For a debt to be nondischargeable, money, property, services or credit must have been obtained by:

(B) use of a statement in writing—
  (i) that is materially false;
  (ii) respecting the debtor's or an insider's financial condition;
  (iii) on which the creditor to whom the debtor is liable for such, money, property, services or credit reasonably relied; and
  (iv) that the debtor caused to be made or published with intent to deceive;

11 U.S.C. § 523(a)(2)(B).

The Bank, which is the plaintiff in this adversary proceeding, has the burden of proof by a preponderance of the evidence as to each of the elements delineated under 11 U.S.C. § 523(a)(2)(B) as nondischargeable fraud. *Grogan v. Garner,* — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In the instant case, the element of reasonable reliance has not been established. This is not a case where a creditor previously received financial statements and thereafter extended credit without any further investigation. *See Kentile Floors, Inc. v. Winham,* 440 F.2d 1128 (9th Cir. 1971). Nor is this a case where the creditor had the right to assume that it was not dealing with an unscrupulous debtor and did not have to make any intensive investigation *after* receiving the debtor's written financial statement, which did not raise any suspicions. *See In re Hough,* 111 B.R. 445 (Bankr.S.D.N.Y.1990). The Bank here was in no position to conduct any investigation as to the veracity of the figures contained in any of the financial statements delivered to it in connection with the Hampshire loan

because it made the loan contemporaneously with the receipt of such financial statements. Manifestly, the element of reliance was absent, much less that any such reliance was "reasonable." The Bank chose to rely on Hampshire's favorable reputation in the community as a substantial franchised automobile dealership with which the Bank wanted to commence a banking relationship. The reference to the debtor's false personal financial statement as a basis for claiming that its debt is nondischargeable is merely an afterthought, based on hindsight and lacking in foresight.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 28 U.S.C. 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(I).

2. The plaintiff Bank has failed to sustain its burden of proof by a preponderance of the evidence that it reasonably relied on the debtor's written personal financial statement when the Bank made a $250,-000.00 loan to Hampshire on March 7, 1989.

3. The plaintiff Bank's complaint against the debtor for a determination that the debtor's liability to the Bank under his personal guaranty of the obligations of Hampshire is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) shall be dismissed for failure to prove that the Bank reasonably relied on the debtor's written personal financial statement when it made the $250,-000.00 loan to Hampshire.

SETTLE ORDER on notice.