BATESVILLE TRUCK LINE, INC., *v.* MARTIN.

4-9591                                           243 S. W. 2d 729

Opinion delivered November 26, 1951.

604

*Charles F. Cole* and *Ed E. Ashbaugh,* for appellant.

*W. D. Murphy, Jr.,* and *M. F. Highsmith,* for appellee.

MINOR W. MILLWEE, Justice.    Appellee Clay Martin brought this suit to require appellant Gilbert F. Tugwell to specifically perform a contract to transfer to Martin fifty per cent of the corporate stock of Batesville Truck Line, Inc.    The corporation and its stockholders, including Tugwell, were made parties defendant.

Trial resulted in a decree in appellees' favor which directed Tugwell and his wife to transfer the stock to Clay Martin and wife in accordance with the alleged agreement.

The evidence tends to establish the following facts. For several years Clay Martin has owned and operated a motor truck freight line between Beebe and Little Rock, Arkansas, under a permit from the Arkansas Public Service Commission. In 1947 Martin, in addition to the Beebe line, also began operating between Little Rock and Batesville, Arkansas, under some arrangement with the Local Truck Line. Gilbert F. Tugwell, whose employment at Batesville with another freight line had recently been terminated, was employed by Martin to handle the Batesville end of the new operation.

Martin's operation between Batesville and Little Rock was stopped in a proceeding instituted by a competing truck line, but the nature of such proceeding is not disclosed by the evidence. Martin then employed counsel and filed application for a certificate of convenience and necessity to operate as a common carrier of general commodities between Little Rock and Batesville. After conferring with a member of the commission, Martin's attorney concluded that it would be inadvisable to press for immediate action on the application on account of Martin's previous connection with the operations of the Local Truck Line and the application was withdrawn. Tugwell was then consulted and, upon the advice of counsel, Martin and Tugwell agreed to form a corporation and file a new application in the name of said corporation. The Batesville Truck Line, Inc., was organized with 100 shares of no par value stock issued as follows: 95 shares to Tugwell, 3 shares to his wife, and 1 share each to Tugwell's brother and Harvey Sheffield. Martin paid the initial expenses incurred in organizing the corporation and in filing the application which was denied by the commission on December 30, 1947.

On appeal to the Pulaski Circuit Court the order of the commission was reversed in a judgment directing

issuance of a permit to the corporation, which was done on July 26, 1948. The circuit court judgment was appealed and affirmed by this court on January 24, 1949, in *Ark. Motor Freight Lines, Inc.* v. *Batesville Truck Line, Inc.,* 214 Ark. 448, 216 S. W. 2d 857. In that case we upheld the circuit court's determination that the service then being rendered by another line was inadequate and that the service proposed by Batesville Truck Line, Inc., was needed.

Although there is some testimony relative to an agreement as to future ownership of the stock at the time the corporation was formed, the evidence is insufficient to establish any definite contract between the parties at that time. It is clear, however, that Martin remained in the background while Tugwell prosecuted the appeal to circuit court resulting in reversal of the order of the commission, and that both contributed to the payment of expenses in connection with the appeal.

Clay Martin and wife testified that immediately after issuance of the permit Tugwell and Martin entered into an oral agreement under which Tugwell and his wife were to handle the Batesville end of the operation and be paid weekly at the rate of 10c per cwt. for all freight picked up and delivered, while the Martins would be paid a like sum for handling the Little Rock end of the operation. It was also agreed that any profits that remained after payment of operating expenses and the cost of obtaining the permit would be divided equally between the parties. According to the Martins, it was further agreed that they would own fifty per cent of the corporate stock which the Tugwells would hold in trust for the Martins. The attorney who represented both parties throughout the proceedings testified that shortly after issuance of the permit, Martin and Tugwell informed him that they had agreed to operate on a "50-50 basis." On the other hand, Mr. and Mrs. Tugwell denied making the agreement or that Martin had any interest in the corporation other than as an employee-truck driver. The actions and conduct of the parties subsequent to the granting of the permit strongly support the testimony of

the Martins as to the agreement and tend to refute the contentions of the Tugwells.

Upon issuance of the permit it became necessary to procure insurance and hauling equipment in order for the corporation to qualify under its permit. After contacting an insurance agency at Cabot, Arkansas, Martin and Tugwell together negotiated the purchase of insurance from a general agent at Little Rock. This agent testified that Martin and Tugwell represented themselves as co-owners of the corporation, but did not want Martin's name used because of some circumstance existing with the commission. Martin paid the insurance premiums in the amount of $452.

Tugwell and Martin then arranged for the purchase of a tractor and trailer. Martin owned a used trailer which was accepted by the seller for one-half the down payment of $1,160, and both parties signed the conditional sales contract. Although the Tugwells testified that most of the monthly installments, totaling $2,750 and representing the balance of the purchase price, were paid from their own personal funds, this testimony was refuted by company records kept by Mrs. Tugwell and the weekly reports she made to the Martins. These reports show that all monthly installments were paid from company assets and that Martin and Tugwell were paid the same amount as drayage each week for freight handled. When insufficient funds were on hand to make the monthly payments due on the truck and trailer, equal amounts were deducted and withheld from the drayage due each party to make up the deficit.

In September, 1948, Martin discharged the driver employed to drive the company truck between Little Rock and Batesville and his right to do so was never questioned. It was then agreed that Martin should operate the truck and receive the same salary formerly paid the discharged employee in addition to the 10c per cwt. drayage. When the company tractor broke down in January, 1949, it was agreed that Martin would use his own tractor to pull the company trailer for $25 per trip until the

company tractor was repaired. After it was determined that the tractor could not be repaired, it was agreed that Martin should continue to use his tractor, pay all expenses in connection therewith, and receive 30c per cwt. for all freight hauled in addition to the 10c per cwt. for freight picked up and delivered in Little Rock. This arrangement was still in effect at the time this suit was filed and the chancellor ordered it continued until a final order was made. Including the $580 trade-in allowance on the truck and trailer, the Martins paid out $1,391.74 to defray costs of obtaining the permit and starting operations which amount was in excess of that contributed by the Tugwells. There are other circumstances which show that the parties regarded and held each other out as equal owners in the business.

After this court affirmed the judgment of the circuit court granting the permit, Tugwell refused to furnish Martin with copies of the weekly reports and to comply with other terms of the agreement under which they had operated for several months. He also refused to transfer the stock and the instant suit was brought on February 18, 1949.

This court is committed to the rule that the statute of frauds does not extend to trusts of personal property and that such trusts may be created and proved by parol. This rule was applied to a trust of corporate stock in *Oliver* v. *Oliver*, 182 Ark. 1025, 34 S. W. 2d 226, where it was said that the evidence to establish the trust must be clear and convincing. We conclude that the proof on behalf of appellees is sufficient to meet the requirements of the rule in the instant case and that the trust in favor of the Martins in fifty per cent of the stock in Batesville Truck Line, Inc., was established by clear and convincing evidence.

For reversal of the decree appellants earnestly contend that Martin is precluded from maintaining this suit under the equitable maxim: "He who comes into equity must come with clean hands." It is argued that Martin and his attorney entered into a conspiracy to perpetrate

a fraud on the Public Service Commission prior to formation of the corporation and the filing of the application for a permit in the corporate name. We do not decide the point. Any fraud that might have been perpetrated on the commission was fully participated in by Tugwell. Assuming, without deciding, that Martin and Tugwell jointly perpetrated a fraud on the commission in obtaining the permit, this would not necessarily preclude the maintenance of the instant suit by Martin.

The principle involved in the "clean hands" maxim is that equity will not intervene on behalf of a plaintiff whose own conduct in connection with the same matter or transaction has been unconscientious or unjust. The rule has been applied in many cases where a complainant is seeking to take advantage of his own wrong in connection with the matter before the court. Although the principle is broad in its operation, it has its limitations and does not apply to every unconscientious act or inequitable conduct on the part of a plaintiff. Pomeroy's Equity Jurisprudence (5th Ed.) Vol. 2, § 399. In 19 Am. Jur., Equity, § 475, it is said: "The wrong which may be invoked to defeat the suit must have an 'immediate and necessary relation' to the equity which the complainant seeks to enforce against the defendant or it must 'in some measure effect the equitable relations between the parties in respect of something brought before the court for adjudication.' If the wrong is shown to be merely collateral to the complainant's cause of action, it does not constitute matter of defense."

It is also held that the maxim may not be successfully invoked if the alleged wrongful conduct of the plaintiff appears not to have injured or prejudiced the defendant. Hence the party to a suit complaining of a wrong must have been injured thereby in order to justify the application of the principle of "unclean hands" to the case of his opponent. 19 Am. Jur., Equity, § 474; Anno. 4 A. L. R. 58.

The Washington court in *Langley* v. *Devlin,* 95 Wash. 171, 163 Pac. 395, 4 A. L. R. 32, held that a complainant

who had a cause of action against a defendant is not precluded from recovering by reason of the fact that both of them were parties to a wrong which was practiced upon a third person. We followed this holding in *Sliman* v. *Moore,* 198 Ark. 734, 131 S. W. 2d 1. In that case the parties entered into a scheme to defraud Moore's creditors. There was no consideration for notes and a deed of trust to real estate executed by Moore to Sliman. After bankruptcy proceedings against Moore, the trustee in the deed of trust proceeded to advertise the lands for sale under a power of sale in the instrument. Moore filed suit in equity against Sliman and the trustee to enjoin the sale and cancel the deed of trust. Sliman challenged Moore's right to maintain the suit under the "clean hands" doctrine. In sustaining Moore's right to maintain the suit, the court said: "The maxim: 'He who comes into equity must come with clean hands' means no more than that he who has defrauded his adversary to his injury in the subject matter of the action, will not be heard to assert a right in equity. While courts will not, as a rule, measure equities between wrongdoers, they are quite as careful to deny to any man the advantage of his own wrong." The court also said: "The purpose of the maxim is to secure justice and equity, and not to aid one in an effort to acquire property to which he has no right."

We think the principles applied in *Sliman* v. *Moore, supra,* are controlling here. The evidence does not warrant a finding that Martin perpetrated a fraud on Tugwell or that Tugwell has been injured by any wrong perpetrated by their collusion, unless Tugwell's right to take property that does not belong to him could be classified as an injury. To hold that a court of equity cannot examine a contract between the parties that is neither proscribed nor contrary to good morals because of a collateral wrong by both affecting a third party, would lead to the absurd consequence that a defendant in a suit would take a decree equivalent in its legal force to affirmative relief under the plea of corrupt participation. *Langley* v. *Devlin, supra.* To apply the maxim relied on to the facts in this case would 'defeat its purpose. We

conclude that Martin is not barred by the maxim from maintaining this suit.

The decree is affirmed.

PAUL WARD, J., disqualified and not participating.