Albert Plain v. Robert C. Ray

4649                                    432 S.W. 2d 13

Opinion Delivered October 7, 1968

*Rieves & Rieves* and *Fred H. Stafford* for appellant.

*Jake Brick* for appellee.

Lyle Brown, Justice.    Appellant Albert Plain was the plaintiff below.    He brought this suit to reform a deed given Robert C. Ray, appellee, contending that the conveyance was in fact a mortgage.    The trial court found (1) that Plain was in court with unclean hands, (2) that plaintiff was guilty of laches, and (3) that Plain in fact knew he was conveying the property by deed.

At the time of the transaction in 1960, Albert Plain was sixty-four years of age.    He had been a share-cropper most of his life.    He never attended school and could neither read nor write.    However, he was found by the federal government to be capable and worthy of being included in their farm resettlement program. With

the aid of the government he purchased a fifty-acre farm near Earle, Arkansas, in 1944, for which he agreed to pay $5000. He continued to farm the lands until 1959. Apparently because of failing health, Plain executed a five-year lease covering cultivated lands to Robert Gammill beginning with the crop year 1960. The lessee was not interested in utilizing the house, small barn, and truck patch, so Plain continued down through the years to reside there.

By 1960 Albert Plain was in financial distress. Two years previously he had executed a mortgage to Citizens Burial Insurance Co. for $7500 and he was delinquent. He had not paid court-ordered child support for some time, and a judgment for $870 was rendered in March 1960. Outstanding were several open accounts, mostly incurred in his farming operations. His total indebtedness approximated $8000. Plain was informed by an attorney that his property would have to be sold unless he paid the judgment for child support. Since Robert C. Ray had helped Plain secure the loan from Citizens, Plain consulted with Ray for advice and possible help. At Ray's suggestion, Plain garnered most of his bills and submitted them to Ray. At that point the two men gave a different version as to what shortly occurred.

*Plain's Version.* He had known Ray since 1947; several times Ray tried to buy his land but he would not sell; on this occasion Ray told him some papers would have to be signed so there would be security; Ray was *lending* him the money; Ray agreed to lend him enough to pay the debts, about $8000; they went before a notary public; Plain signed with an "X" and there were two witnesses to his mark; and at Ray's request, Plain delivered to Ray the old deeds which Plain possessed to the place.

*Ray's Version.* In September 1960, Plain came to Ray seeking help; Plain offered to sell the land to keep Lucinda (his former wife) from getting it; Plain

was instructed to gather up his bills and return; a few days later he returned with part of his bills which totaled approximately $8000; "I believe," so Ray related, "I can pay off all this indebtedness and put you clear for that farm." Ray was willing to make the deal if the bills did not exceed $10,000.

There are other significant facts which are undisputed. The deed was recorded and Ray paid all of Plain's bills. That included several open accounts and also some small cash payments to Plain. In March 1961 Plain was cited for contempt for failure to pay child support. Ray paid the judgment and Plain testified that he had sold his farm. The court made a finding that Plain no longer owned any realty. From 1960 until the date of trial, the cultivated lands had been leased and considerably improved. All lease monies had been paid to Ray. Although the value of the land as of 1960 is in dispute, one appraiser placed the figure as high as $20,000. Another estimate was considerably less. However, it is clear to us that Ray picked up a real bargain because within three years after the purchase he borrowed $10,500 from the Federal Land Bank. Of course that may be offset somewhat by the fact that Plain has through the years used the house, outbuilding, and truck patch free of rent.

The consideration was looked upon by the trial court as being substantially inadequate. It was also the impression of the court that Plain had not been fairly treated when that treatment is judged by moral standards. With those conclusions we agree. On the other hand, we agree with the trial court's conclusion that the law cannot afford relief to Plain in view of his own undisputed actions:

1. He executed a warranty deed and the form of execution is not questioned. It conformed to all the solemnities required by law. For that instrument to now be treated as a mortgage, the evidence must be

clear, unequivocal, and convincing. *Kerby* v. *Feild,* 183 Ark. 714, 38 S.W. 2d 308 (1931).

2. Plain subsequently signed a witnessed statement to protect the lessee, Gammill, in paying the rents to Ray. That statement recited that the lands had been sold to Ray.

3. Plain accepted payments from the Welfare Department with which to pay rent to Ray. Naturally Plain had to represent that he was a tenant.

4. When Plain was cited into court for failure to pay the judgment for non-support, he convinced the judge that he owned no property whatever. As a result of that representation he was apparently relieved of further payments. The court made a specific finding that Plain had no assets.

5. Approximately seven years elapsed before Plain sought reformation.

In his maneuvers before the court in the nonsupport hearing, Plain was in much the same position as Hubert Marshall in the case of *Marshall* v. *Marshall,* 227 Ark. 582, 300 S.W. 2d 933 (1957). In 1941 Hubert executed a warranty deed to his co-heirs by which he conveyed his interest in the property. In a proceeding some fifteen years later, Hubert sought to have the deed reformed and declared a mortgage. Hubert admitted that as to his 1941 creditors he treated the instrument as a deed, but as to himself he considered it a mortgage. This court held that the "clean hands doctrine" precluded Hubert from now claiming the instrument to have been a mortgage. Another case involving the same doctrine is *McClure* v. *McClure,* 220 Ark. 312, 247 S.W. 2d 466 (1952). The evidence showed that Dr. McClure deeded a building to his wife in the

hope of placing it beyond the reach of the husband's creditors. This court held that Dr. McClure could not invoke the aid of equity to set aside the deed.

This case is distinguishable from *Batesville Truck Line, Inc.* v. *Martin,* 219 Ark. 603, 243 S.W. 2d 729 (1951). In that case a transit permit was granted by the Public Service Commission to a dummy corporation formed by Martin and Tugwell. Martin's name was withheld from the PSC proceedings because otherwise the permit would have been denied. Tugwell later refused to transfer to Martin any of the stock. Martin filed suit for specific performance to obtain his share of the corporation. Tugwell's plea of "unclean hands" against Martin was denied for the reason that Tugwell participated in the fraud on the commission (if in fact a fraud was perpetrated). To have held otherwise would have permitted Tugwell to hold property which he had obtained by fraud and which was in fact not his own. In the case at bar the trial court did not find Ray guilty of any fraud. The court made a specific finding that Plain knew he was giving to Ray a deed and not a mortgage. The court pointed out that Plain had had considerable experience with the government farm agencies in annually executing crop mortgages. To this finding we would add a point of significance, namely, that Plain freely surrendered to Ray the original deed which Plain held to the place. The most that can be said of the court's criticism of Ray was to the effect that he drove a hard bargain. In view of the other numerous acts of Plain which we have recited, together with many instances of testimonial evasiveness, we cannot say the chancellor was in error in his refusal to reform the deed.

Affirmed.

FOGLEMAN, J., not participating.