In re CASA NOVA OF LANSING, INC., Debtor.

CASA NOVA, INC., Plaintiff and Counter–Defendant,

v.

CASA NOVA OF LANSING, INC., Defendant and Counter– Plaintiff.

CASA NOVA OF LANSING, INC., Plaintiff,

v.

William FALSETTA, Defendant.

Bankruptcy No. SL 91–85736. Adv. No. 91–8696.

United States Bankruptcy Court, W.D. Michigan, S.D.

Oct. 27, 1992.

---

Honigman, Miller, Schwartz & Cohn (Frederick M. Baker, tried), Lansing, Mich., for defendant/counter-plaintiff/plaintiff Casa Nova of Lansing, Inc.

Abood & Doyle, P.C., (Thomas A. Doyle, tried), Lansing, Mich., for plaintiff/counter-defendant Casa Nova, Inc. and defendant William Falsetta.

## OPINION AND ORDER

JO ANN C. STEVENSON, Bankruptcy Judge.

### I. Introduction.

To say that this was a vigorously contested trial would be an understatement. The first glimmer of the rocky contest ahead appeared as early as opening statements. What better indication of the antagonism which had developed between the parties and counsel, and of the spirit in which this case would be tried, than Casa Nova, Inc. and William Falsetta's motion to dismiss Casa Nova of Lansing, Inc.'s case on the basis of the alleged failure of counsel to include in opening statement every fact needed to make out a *prima facie* case? This was but the opening volley in six days of trial (spread out over several months) that encompassed admissions of perjury, multiple assertions of the Fifth Amendment privilege against self-incrimination, and endless objections and jibes. Sadly, the bitter aftertaste of the duplicity

and animosity between these parties has lingered with the court long after trial ended.

This sordid affair arises out of the sale of a family restaurant in Lansing called the Casa Nova. The seller of the restaurant was Plaintiff/Cross–Defendant Casa Nova, Inc. ("CN"). The purchaser was Defendant/Cross–Plaintiff Casa Nova of Lansing, Inc. ("CNL"). CN is a corporation wholly owned by Defendant William Falsetta ("Falsetta"). CNL is a corporation formed for this purchase by Michael Spadafore ("Spadafore") and his brother-in-law James Solomon ("Solomon"). CN owned the business assets of the Casa Nova, while Falsetta and his sister-in-law Rose Falsetta owned the real property which was originally leased to CN. Spadafore and Solomon had a long-standing relationship with Rose Falsetta, who was a family friend of many years.

CN's complaint which originated in state court seeks retransfer of a liquor license, foreclosure of its security interest in various assets of the business, and money damages. The case was removed to this court upon CNL's filing of bankruptcy. There appears to be no dispute that a contract was formed or that CNL defaulted in its performance. Rather, CNL asserts the affirmative defenses of prior material breach and fraud, which are also the basis of its counterclaim and third party complaint.

Counts I–IV of CNL's counterclaim/third party complaint state a variety of iterations of fraud: fraudulent concealment (silent fraud), actual misrepresentation (fraud), innocent misrepresentation, and equitable subordination (actually a remedy for fraud). In view of its conclusions of fact and law, the court in this case finds it unnecessary to address any of these claims except the actual misrepresentation claim which implicitly encompasses the elements of the others. The only other claim remaining is found in Count V, breach of contract.[1] The basis of CNL's claim of breach of contract is that Falsetta individually breached a covenant not to compete.

■ The elements of a cause of action for fraud under Michigan law are 1) the making of a material representation by the defendant; 2) that was false; 3) the falsehood of which was known by the defendant at the time the representation was made, or that it was made recklessly as a positive assertion without any knowledge of its truth; 4) upon which the defendant intended the plaintiff to rely; 5) that the plaintiff did in fact rely upon the material misrepresentation; and 6) that resulted in the injury complained of. *Hi–Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813 (1976) (quoting *Candler v. Heigho*, 208 Mich. 115, 121, 175 N.W. 141 (1919)). The other constructs of fraud pled by CNL are variations on this theme which the court finds unnecessary to address in view of the holding reached. Because this case has been bifurcated as to the issues of liability and damages, the court need only concern itself with the first five of these six elements at this stage of trial.

The fraud claim in this case is, to say the least, unique. CNL alleges that Falsetta represented that he was "skimming," *i.e.* not reporting as income to the IRS, $200,-000.00 per year from the business. CNL further claims that it relied upon this representation in purchasing the restaurant and that this representation was a material one. The falsehood of the representation, if made, is established by the parties' stipulation that Falsetta's profit and loss state-

---

1. Allegations in this count asserting a cause of action for breach of warranty were dismissed by the court at trial in an order dated June 1, 1992. That order also dismissed VI and VIII of the complaint pursuant to a stipulation of the parties. *See* Tr. 945. Counts IX, X, XI and XII do not truly state independent causes of action as much as they do remedies for the various wrongs alleged in other counts and therefore are not addressed at this point in the proceedings. This leaves 'unaccounted' Count VII asserting a claim under the Michigan Consumer Protection Act, Mich.Comp.Laws Ann. § 445.901 *et seq.* While the court can find no order specifically dismissing this count, in its post-trial brief at 1 CNL states that all remaining counts of its complaint except the fraud and breach of contract counts in essence merely state the various forms of relief which it is seeking. On this basis the court does not interpret Count VII as stating a cause of action independent from those pled in Counts I–V.

ments, which did not reflect this additional $200,000.00, were accurate as to receipts.

## II. Jurisdiction.

■ A jury demand was made by CNL in its counterclaim filed in Ingham County Circuit Court. However, this matter was set for a bench trial without objection by either party, and was in fact tried to the court without objection. The court concludes that any right to a jury trial was waived by the parties. *United States v. 1966 Beechcraft Aircraft Model King Air A90 Cream with Burg & Gold Stripes SN:LJ–129, FAA Reg:N–333GG, Equipt,* 777 F.2d 947, 950–51 (4th Cir.1985); *see also Cain Partnership, Ltd. v. Pioneer Investment Services Co. (In re Pioneer Investment Services Co.),* 946 F.2d 445 (6th Cir.1991) (failure to object to bankruptcy court rendering final orders in noncore matter operated as implied consent to jurisdiction). Accordingly the prohibition in this circuit against bankruptcy courts conducting jury trials, *see Rafoth v. National Union Fire Insurance Co. (In re Baker & Getty Financial Services, Inc.)* 954 F.2d 1169 (6th Cir.1992), does not arise in this case.

Both parties have asserted that this is a core proceeding. The court finds that this is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (C) and (K) and that the court therefore has jurisdiction to enter final orders and judgments.

## III. Findings of fact.

In 1987 Spadafore and Solomon began talking about going into business together. Sometime in late 1987 Solomon learned that Falsetta was thinking about selling the Casa Nova. A meeting was arranged in January 1988 between Falsetta, Solomon, Spadafore, and Spadafore's uncle, Pete Spadafore, at Pete Spadafore's office. Pete Spadafore was included by Spadafore and Solomon because he had prior experience in the restaurant, franchising, and real estate businesses.

■ At that meeting the parties discussed the price of the restaurant and the income of the business. The testimony of the witnesses conflicts as to the income issue. Spadafore and Solomon both claim that Falsetta told them he was grossing $2 million annually, $200,000 of which was being "hidden," or taken as unreported income. Falsetta denies making any such statement. This alleged misrepresentation forms the heart of CNL's fraud claim in this case. The court believes that, in light of the credibility problems that all of the participants to this meeting who were called as witnesses face, the testimony of Pete Spadafore would have been helpful in resolving this dispute; however, neither party produced this witness. The fact that Pete Spadafore was not produced cuts against CNL, as it has the burden of proof by clear and convincing evidence on the issue of misrepresentation. *See, e.g., Hi-Way Motor Co., supra,* 398 Mich. at 336, 247 N.W.2d 813 (burden of proof rests on the party alleging fraud and must be met by clear, satisfactory and convincing evidence). The court does not view the failure to produce Pete Spadafore as critical, however, because even if the misrepresentation was not made at this meeting other evidence of this misrepresentation offered by CNL meets this burden.

In consideration of the credibility problems discussed below, the court prefers to rely on documents introduced into evidence where possible. The most convincing document showing that the representation was made that there was additional money being taken out of the business is, surprisingly enough, Exhibit I, which was one of CN and Falsetta's exhibits. That exhibit is a handwritten offer to purchase the Casa Nova which Falsetta admits he received from Spadafore. It contains this statement: "Would like to see your bank account showing 4,000.00 per week for 2 years deposited." [2] Spadafore testified that this was a request for some concrete evidence that the skimming actually took place, a statement consistent with this contemporaneous writing.

Falsetta's response to this statement was totally unconvincing. Falsetta testified

---

**2.** Spadafore testified that he had been told numerous times that $4,000 per week, or $208,000 annually, was being skimmed from the business. While Spadafore's testimony is of limited usefulness given the credibility problem, it does supply the math.

that he thought this statement referred to the amount of money Spadafore and Solomon thought *they* could "take," or skim, from the business. Tr. 1060. He went on to say that he "absolutely" did not tell them that he was "taking" this amount. *Id.* His linkage of this statement to the concept of skimming establishes an agreement by the parties on the topic of this sentence. But the construction given by Falsetta is unsupported by the document itself. If the statement was merely intended to reflect the amount Spadafore and Solomon thought they could skim, then there could be no bank record for two years of deposits because obviously at that point in time they had not operated the restaurant at all, nor would there be any reason for them to communicate this intent to Falsetta. Such records could only exist if *Falsetta* had made the deposits. The inclusion of this sentence in a contemporaneous writing which Falsetta admits receiving is convincing evidence that Falsetta made the representation to Spadafore and Solomon that he was skimming.

Other documents further support the finding that Falsetta represented that he was taking cash out of the Casa Nova under the table. Exhibit 1 was Spadafore's contemporaneous notations on his copy of the Casa Nova profit/loss statement for the year ending September 30, 1987. Just above the total net profit figure on this exhibit an addition of $208,000.00 is pencilled in. The only other reference to this number, and only description suggesting its source, is contained at the bottom of the document:

Profit on 208,000.00

No taxes
we're taking out

Based upon this statement and Spadafore's admission that after the sale was consummated CNL did skim to cover under the table payments to employees after the sale was completed, the court finds that Spadafore intended to continue skimming post-closing as he believed Falsetta had in the past.[3] Although operations were apparently never successful enough to allow this plan to reach fruition, Spadafore's conclusion that he could skim this specific amount, supports a conclusion that Spadafore was getting this number from somewhere rather than pulling it out of thin air. When read in conjunction with Exhibit I the source appears to be Falsetta.

The possibility that the calculations on Exhibit 1 were fabricated after the sale is rebutted considerably by Exhibit 2 (page 1). Exhibit 2 (page 1) contains debt service calculations by Jacquelyn Pulford, an accountant hired by Spadafore, which start with a profit figure of $225,000.00. The same figure was reached in Exhibit 1 using the $208,000.00 addition. No evidence was offered undermining Ms. Pulford's credibility, and the court finds that she was a credible witness. Spadafore gave a logically consistent explanation for reaching a profit figure of $225,000.00 which included the $208,000.00 figure. Credible testimony establishes that this number was in consideration at the time the purchase was contemplated. These documents therefore also tend to support CNL's claim that Falsetta made the misrepresentation.

Based upon Exhibits 1, 2 (page 1), and I the court finds that at some point prior to the formation of a contract Falsetta represented to Spadafore and Solomon that there was an additional $208,000.00 in unreported annual income in the business with the intention that Spadafore and Solomon rely upon this misrepresentation. The court further finds that Spadafore and Solomon fully intended to continue this prac-

---

**3.** The court is not impressed with Spadafore and Solomon's explanation that they had to continue the practice of making payments under the table in order to retain key employees. When Spadafore and Solomon learned of this practice no sale had been consummated; they could have easily walked away. Their decision to go forward in light of this revelation was made of their own free will. If in reaching that decision they concluded that the venture would only be successful if they continued an illegal practice, the choice to do so was likewise their own.

tice. Spadafore's plans to skim have already been discussed. The court believes that Solomon acquiesced in this plan. Indicative of his perspective on the propriety of skimming is his testimony regarding skimming at Cabaret, a night club owned by Solomon's family:

Q: [By Mr. Doyle] Had you been involved in any kind of that activity [skimming] at the Cabaret?

A: Never. Cabaret's been in the red since it's been in business. They don't have any opportunity to skim any kind of money off of it.

Tr. at 803–804. Solomon's answer focuses on the ability to skim rather than the propriety of the activity. The court can only conclude that his answer as it relates to the Casa Nova would be the same: there was no opportunity to skim because the business was not profitable. Had the opportunity arisen, however, the court believes Spadafore and Solomon would have taken it.

After additional negotiations the parties reached an agreement for the sale of the business which was structured as an asset purchase. The purchase price was $800,-000.00 with $400,000.00 down and the balance financed by a nonrecourse fifteen year promissory note payable to CN amortized over 20 years at 10% interest per annum and secured by the business assets. The real estate would be leased to CNL by Falsetta and Rose Falsetta. Finally, the parties agreed to a covenant not to compete.

While the documentation was being prepared and the closing was pending, Falsetta revealed to Spadafore and Solomon that under the table payments and transfers were being made to employees. Testimony and exhibits regarding this practice were admitted over objections as to relevancy because they were offered to establish that CN relied upon Falsetta's misrepresentation. The court finds this evidence conclusive on the issue of reliance. Page 3 of Exhibit 14 shows the calculations that Spadafore made prior to closing in which he took into account the revised costs of operating the business including under the table transfers. Without reviewing these calculations in detail, Spadafore reached the conclusion that the business remained profitable, although not by much. However, this calculation was premised on inclusion of $200,000.00 in "misc. profit" above $50,000.00 in "corp. profit" to reach gross profits. The decision to go forward with this $800,000.00 purchase for a barely profitable concern may have demonstrated questionable business judgment, but that fact goes to the issue of damages. Spadafore made that judgment based upon calculations which included the skimmed amount. Given the thin margin which Spadafore concluded he faced even with an additional $200,000.00 in income, there is no question that CN relied upon Falsetta's representation.

The court finds that the under the table transfers to the employees also served to establish the reasonableness of Spadafore and Solomons' reliance. Having been provided with credible evidence that Falsetta defrauded the IRS for the benefit of his employees, it was reasonable to believe his statement that he was doing the same for himself.

CN and Falsetta contend that the reason that Spadafore and Solomon bought the Casa Nova was that they wanted to franchise the Casa Nova name and that profitability was unimportant to them. They conclude from this that there was no reliance on the misrepresentation. The court finds that while there was talk of franchising at the early stages of the transaction, there was no credible testimony by any witness that the primary purpose of this transaction was to purchase the Casa Nova name for franchising. Accordingly, the court finds that Spadafore and Solomon relied upon the misrepresentation and that their reliance was reasonable.

The sale was closed on October 3, 1988. As with all other aspects of this transaction, there are some irregularities in the closing documents. The sale agreement refers to Casa Nova, Inc. as the "Seller" in its opening paragraph. Exhibit 15. However, in several places the purchase agreement refers to the "Seller" as though it is a

natural person. This first occurs in the critical language of the covenant not to compete:

> Seller agrees that *he* will not, directly or indirectly, engage in any business similar to the business of or in competition with the business presently being operated by Seller *as either an individual, partner, joint venturer, employee, agent, or salesman for any person, firm or corporation, or as an officer, director, or employee of any corporation engaged in or which may engage in such business*, and Seller further agrees that *he* will not, directly or indirectly, own, manage, operate, control, or participate in the ownership, management, operation, or control of, or be connected in any manner with, any business similar to the business heretofore carried on by *him* as THE CASA NOVA RESTAURANT[.]

> The terms of this covenant not to compete shall commence as of the closing date and shall remain in force for a period of Ten (10) years from and after the closing date and said covenant shall extend for the area within Twenty (20) miles of 3015 S. Logan, Lansing, Michigan, as determined by the most direct driving route.

> Notwithstanding anything to the contrary herein stated in this paragraph three, purchasers may, upon the furnishing of appropriate assurances of the following conditions, permit use of the name "CASA NOVA RESTAURANT" to be used by *you or a member of your immediate family* for one restaurant within the City of Lansing except the downtown area of Lansing. . . .

Exhibit 15, ¶ 3 at 2–3 (emphasis supplied). The agreement reverts to referring to the Seller as "it" until paragraph 21, where again the Seller is referred to as "him" in connection with an option to provide an indemnification agreement in lieu of compliance with the Bulk Sales Act. The agreement was signed twice by Falsetta: once as president of CN, and once without restriction.

Falsetta admitted that the covenant not to compete was his promise. Tr. 135–136. Nevertheless, as a result of the documentary irregularities the parties do not agree whether the covenant not to compete, assigned a value of $300,000.00 in the purchase agreement, applied to Falsetta individually. Falsetta's attorney in the transaction, Michael Otis, testified that he did not believe that the covenant was intended to bind Falsetta, although he did believe that the second signature by Falsetta served to bind him individually in some manner. He also agreed that a covenant not to compete that only bound the corporation would be meaningless. Attorney Edmund Sikorski, who represented Spadafore and Solomon in the transaction, testified that the covenant was intended to bind Falsetta individually.

In February 1991 Falsetta began operating a restaurant four miles from the Casa Nova under the name "Falsetta's." The menu featured substantially the same bill of fare as offered at the Casa Nova. The menus were cloaked in the old Casa Nova menu covers on which Falsetta had the Casa Nova name spray-painted out and the name "Falsetta's" painted in its place. Falsetta testified that he never asked Spadafore or Solomon for permission to open his restaurant.

A significant portion of the testimony addressed two post-closing matters. First, CN and Falsetta contended that Spadafore and Solomon's failure to bring an action for fraud until they were sued on the promissory note undermined their fraud argument. Consequentially extensive evidence was introduced regarding the various dealings of the parties until the time of CNL's default. The second post-closing matter was a bizarre episode in which Falsetta is alleged to have removed some $300,000.00 to $500,000.00 in cash from a floor safe in the basement of the Casa Nova. Spadafore testified that enough currency was taken from the basement to fill two serving carts and that the trunk of Falsetta's car was stuffed to overflowing with money. This testimony was offered over objection to explain why Spadafore and Solomon were dilatory in enforcing their claim against CN and Falsetta. The argument goes that witnessing this spectacle convinced them of

the truth of Falsetta's statement and thus it took some time for them to discover the fraud. While this testimony on both issues was admitted at trial, the court accords it little weight. With the obviously illicit nature of much of what occurred between these parties, there are any number of possible reasons why Spadafore and Solomon may not have wished to sooner air their dirty laundry in court. Since the court finds the post-closing conduct of the purchasers of minor significance it follows that the same weight attaches to the seller's post-closing conduct.[4]

### IV. Credibility issues.

In making the findings of fact above the court gave consideration to the credibility of three key witnesses in this case: Falsetta, Spadafore, and Solomon.[5] Under FED. R.BANKR.P. 8013, "Findings of fact [by the bankruptcy court], whether based on oral or documentary evidence, shall not be set aside [on appeal] unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." The clear and convincing standard has been interpreted to require " 'the most cogent evidence of mistake or miscarriage of justice' " to warrant reversal. *Slodov v. United States (In re Slodov)*, 552 F.2d 159, 162 (6th Cir.1977) (quoting *McDowell v. John Deere Industrial Equipment Co.*, 461 F.2d 48, 50 (6th Cir.1972)) *rev'd on other grounds*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978)); *see also Perkins v. Petro Supply Co., Inc. (In re Rexplore Drilling, Inc.*, 971 F.2d 1219, 1224 (6th Cir.1992); *Newton v. Johnson (In re Edward M. Johnson & Associates, Inc.)*, 845 F.2d 1395, 1400 (6th Cir.1988). The ratio-

nale behind this rule is that the trial court, viewing the demeanor, body language, tone, and reactions of the live witnesses, is in a better position to evaluate credibility than an appellate court having only the benefit of a written transcript. These intangible elements played a significant part in the credibility assessments reached in this matter. In reviewing the transcript the court perceived a considerable contrast between the impact of the live testimony and the written words. Considering these factors as well as those detailed below, this court finds neither Falsetta nor Spadafore credible and Solomon only marginally so.

Falsetta's credibility problems begin with his admission that he has perjured himself by signing false tax returns in the past.[6] Falsetta confessed that he had engaged in the practice of paying employees for health insurance, pensions, and payroll taxes without reporting these payments to the IRS. Tr. 100. Falsetta directly admitted that he signed tax returns certifying under penalty of perjury that they were accurate when he knew them not to be so. Tr. 139. The court finds that these statements are permissible impeachment under FED.R.EVID. 608(b). In addition to their relevance to the issue of credibility, they call into question the veracity of the parties' stipulation that the profit/loss statements provided by Falsetta to Spadafore and Solomon were accurate as to receipts. This court finds it unnecessary to look behind this stipulation to resolve this case, but in light of the questionable nature of all the parties' testimony the court is not inclined to believe that the parties entered into this stipulation because it was true.[7] The court is skepti-

---

4. The court must admit, however, that this testimony had a much higher entertainment value.

5. The court notes that two other witnesses, Mickey Ezzo and David Mataya, also were of questionable credibility. However, their testimony is of limited significance given the conclusion the court reaches.

6. 26 U.S.C. § 7206(1) provides that the willful making of false statements under penalties of perjury in a corporate tax return is a felony punishable by up to $500,000.00 in fines and/or three years' imprisonment.

7. This issue was previously raised by the court at trial. At that time counsel for CNL argued that it might well be true that Falsetta had understated income in the past but that by the time this purchase agreement was entered into his margin had become too thin for continued skimming. The court expressly declines to rule on this issue because the court will not attempt to go behind the stipulation. The court merely wishes to flag this issue for others who may examine the transcript who may not be bound by the stipulation.

cal that Falsetta would take the risk of committing tax evasion for the sake of his employees if he was not likewise doing so for himself. Nevertheless, the court has limited its consideration of this testimony to matters of credibility and of CNL's reliance upon Falsetta's statements.

Another example of less than sterling conduct by Falsetta concerns the Casa Nova menu covers. Falsetta testified that he took about 100 menu covers home from the Casa Nova which were new but deemed unsuitable for use by Falsetta because they "were just falling apart." Tr. 96. Falsetta took them home, he said, to "get them out of the way." Tr. 97. Falsetta later had the Casa Nova name painted over on these covers and the name of his new restaurant painted in. The court had an opportunity to examine one of these repainted menu covers at trial and found it to be far from "falling apart." While the removal of these menu covers only fringes on relevancy as it appears that this occurred before a purchase agreement was reached, Falsetta's testimony regarding this issue seemed disingenuous.

The court also observes that Falsetta exhibited extreme nervousness throughout his testimony on the critical issue of whether he made the misrepresentation in question. Much of this testimony, including his denials of the misrepresentation, was given with his hand in front of his mouth. While it is impossible for the court to fully convey the body language and tone of Falsetta's testimony, the overall impression left by the witness enables the court to place little stock in his testimony.

Spadafore, while having a more believable demeanor, was also convincingly impeached regarding an alleged offer to pay part of the purchase price for the business under the table. The court finds that Spadafore offered to pay Falsetta $200,000.00 of the purchase price under the table without reporting the payment to the Liquor Control Commission. This conclusion is supported by testimony located at Tr. 622–636, and supplemented by Exhibit 4, a page of notes handwritten by Spadafore. The court finds two notations on Exhibit 4 significant. First is a calculation which assumes a $900,000.00 purchase price. An example is given showing $187,500 being subtracted from $900,000.00, leaving a balance of $712,500.00.[8] To the right of this calculation appears this:

700,000   purchase price

200,000   hidden purchase

(cash)

The explanation for the use of the term "hidden purchase" given by Spadafore is that this was the amount of the unreported income. This explanation is unconvincing; the income for any given year does not relate dollar for dollar to the purchase price. The second, more damning notation follows:

Figures to the Commission becomes >  25% of downpayment is on 700,000 with a 10% note onbalance amortized over 15 years___ separately the 200,000 will also be amortized over 15 years!!___

This calculation clearly evinces an intent to pay part of the purchase price to Falsetta without informing the Liquor Control Commission of this payment. The statement undermines Spadafore's credibility both because it establishes a dishonest intent to mislead the Liquor Control Commission,

8. This example is preceded by the following statement: "Amount of deposit becomes amount he has to trust us for—example, 187,000 deposit required by Commission becomes separately a signed disclaimer subtracted from purchase price for our protection." Because Spadafore denies offering to pay any money under the table and Falsetta denies any skimming, the court has little or no aid from the witnesses in interpreting this statement (the explanation offered by Spadafore is completely unconvincing).

Whatever the true intent behind this cryptic statement, it is significant that Spadafore contemplates a requirement that Falsetta "trust" the purchasers for an amount as a mode of "protection." It is clear to the court that Falsetta would have no need to "trust" Solomon and Spadafore if all aspects of the purchase were above board, nor would the purchasers need any "protection" if all representations upon which they were relying were verifiable.

and because Spadafore denied making this offer on the record in this proceeding when confronted with what to this court appears to be an unambiguous document.[9]

Other testimony by Spadafore further calls his credibility into question. Spadafore continued Falsetta's practice of paying employees under the table, discussed earlier. He also admitted that he did not report income to the IRS in an amount corresponding to the amount of these transfers. Finally, the tale of Falsetta hauling bales of currency out of the basement of the Casa Nova strains believability. While the court might consider this testimony from an otherwise believable witness, in the context of the other testimony offered the court can but conclude that this story at the very least suffered from a generous case of elaboration. It is impossible to determine what other aspects of Spadafore's testimony were similarly enhanced.

Finally we come to Mr. Solomon. Of these three incredible witnesses Solomon is perhaps the most credible, if only because there is no documentary evidence to impeach him and because the only witnesses capable of impeaching him had their own problems. Solomon's testimony is likewise tainted by his participation in the tax evasion of not reporting payments to employees and corresponding income which continued after consummation of the purchase. Solomon also denied making the offer to pay part of the purchase price under the table. The court is inclined to believe that such an offer was in fact made and that Solomon had knowledge of that fact. Nevertheless, there was but one fact on which Solomon's testimony had more that secondary relevance, and that regards the discussions at Pete Spadafore's office. For reasons explained above, the court finds it unnecessary to resolve the conflict in the parties' testimony as to the events of this meeting.

### V. Conclusions of law.

#### A. The clean hands doctrine.

This is a deeply troubling case. The court believes that, in a vacuum, the facts

supporting a cause of action for fraud or misrepresentation have been proven by CN by clear and convincing evidence. Indeed, overtones of fraud abound in this case: fraud in reporting income, fraud in reporting expenses and payment of benefits, perjury under oath, contemplated fraud against the Michigan Liquor Control Commission, and fraud against one another. Even the stipulation regarding the accuracy of the profit/loss statements as to receipts appears more a statement of the common interest of the parties in not having certain areas explored than a coalescence of agreed truths. The one thing of which the court has been clearly convinced by these parties is that *both* parties have behaved fraudulently in one aspect or another. It is this which troubles the court. Notwithstanding CNL's urgings, this court cannot examine the question of fraud in a vacuum.

▮ Fraud is a wrong the remedy for which lies in equity. There are twelve principles of equity "so fundamental and essential," JOHN N. POMEROY & SPENCER W. SYMONS, 2 EQUITY JURISPRUDENCE § 363 (5th ed. 1941), that they are considered maxims. The fourth of these is that "He who comes into equity must come with clean hands." *Id.* at § 397. Pomeroy describes the clean hands maxim in the following manner:

> It assumes that the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him *all* recognition and relief with reference to the subject-matter or transaction in question. It says that whenever a party, who, as an *actor*, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere on his behalf, to

---

**9.** Perjury in a bankruptcy case is punishable by up to $5,000.00 in fines and/or five years' imprisonment. 18 U.S.C. § 152.

acknowledge his right, or to award him any remedy.

*Id.* (emphasis in original).

■ An additional requirement of equity to the invocation of the clean hands doctrine to bar a plaintiff's claim is that the plaintiff's iniquity must have resulted in injury to the defendant. *See, e.g., Batesville Truck Line, Inc. v. Martin,* 219 Ark. 603, 243 S.W.2d 729, 732 (1951); POMEROY, *supra* at § 399; 27 Am.Jur.2d, *Equity,* §§ 142, 144. Courts vary from this precept, however, where the parties' conduct intrudes upon the public interest. Thus, where parties have agreed to conceal a contract to circumvent NCAA eligibility rules for collegiate football players, the doctrine will be applied even though both parties to the contract stood to benefit from the transaction. *New York Football Giants, Inc. v. Los Angeles Chargers Football Club, Inc.,* 291 F.2d 471 (5th Cir.1961). The doctrine was also applied where a written contract for the construction of a home at a set price was entered into for the purpose of obtaining federal financial assistance where the true agreement of the parties was on a time and material basis. *Messick v. Smith,* 193 Md. 659, 69 A.2d 478 (Ct.App.1949). And in a case in which the formation of a contract was at issue an argument that a contract was reached between the parties but performance was deferred for tax evasion purposes would be rejected under the clean hands doctrine. *Hoffstot v. Dickinson,* 166 F.2d 36 (4th Cir.1948). As these cases indicate, the interests protected by the clean hands doctrine are wide ranging, but the essence of the inquiry in each case is whether the public is the victim of the inequitable conduct rather than one of the parties to the contract.

■ It is not necessary that the parties plead unclean hands for the doctrine to apply. The court may raise it *sua sponte,* as it does in this case, where the facts warranting its application come to its attention. *Stachnik v. Winkel,* 394 Mich. 375, 386, 230 N.W.2d 529 (1975). As the court in *Stachnik* noted this doctrine is primarily a protection for the integrity of the court rather than a defense for litigants.

A number of parallels can be drawn between this case and *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). In that case plaintiff Automotive sued to enforce a patent assigned to it by the defendants in settlement of a patent interference action. (The interference action was a proceeding to resolve a conflict between a patent application filed by Automotive and the one filed by the defendants.) The settlement in part occurred because Larson, one of the defendants, and others had committed perjury in the patent proceedings. The trial court refused to grant any relief upon the premise that Automotive had unclean hands, soiled by obtaining a patent the premise of which was Larson's misrepresentations. This result was reversed by the seventh circuit, but reinstated by the Supreme Court. After citing the maxim above, the Court added substance with these words:

[W]hile "equity does not demand that its suitors shall have led blameless lives," [citation omitted], as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. [Citations omitted].

This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." [Citation omitted]. Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.

Moreover, where a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions. For if an equity

court properly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public. The determination of when the maxim should be applied to bar this type of suit thus becomes of vital significance.

*Id.* at 814–15, 65 S.Ct. at 997–98.

The Court held that "Automotive has not displayed that standard of conduct requisite to the maintenance of this suit in equity." *Id.* at 819, 65 S.Ct. at 999. In so concluding the Court focused on the facts that Automotive failed to inform the Patent Office of the perjury even though it was under a duty to do so, that it settled with knowledge of the perjury when it could just as well have pursued the case using its new-found evidence, and that the settlement agreement required the silence of the perjurers and their fellow investors so that "Automotive thus acted to compound and accentuate the effects of Larson's perjury." *Id.*

■ This court finds Spadafore and Solomon to be in much the same position. Perjury was the very essence of this contract. This fact was established by CNL's own expert, Gary Brya, a CPA who testified that the purchase price of $800,000.00 could not be supported by the income shown on the books of the business. Falsetta told Spadafore and Solomon that he was defrauding the United States and they not only believed this statement, they banked on it when they agreed to pay $800,000.00 for a business which was worth nowhere near that much on the books. They planned to continue this fraudulent practice after they purchased the business, and in fact did continue it, albeit on a smaller scale. They attempted, unsuccessfully, to add the Michigan Liquor Control Commission to the list of public agencies being deceived. Although the sales agreement does not directly refer to, call for, nor require the practice of skimming, perjury to the detriment of the public was an underlying assumption of the parties throughout this transaction.

It is ironic that, having first attempted to deny Caesar his due, these parties now ask him to sit in judgment of their dispute. The public unquestionably has an interest in the honest reporting of income on tax returns so that services such as those of the very court in which this claim is being litigated may be provided. In these days of looming budget deficits the public interest in collecting taxes takes on even greater importance. CNL's plan and actions in entering into this transaction were based upon, conceived, and executed in frustration of this interest. The court therefore holds that CNL is barred from seeking its aid in enforcing its claim for misrepresentation under the doctrine of unclean hands. Having determined that CNL may not pass through equity to enforce its misrepresentation claim it follows that the remedies it seeks in Counts VII, IX, X, XI, XII, and XIII are not available to redress any wrong arising out of that misrepresentation.

■ This leaves remaining Count V for breach of contract and Falsetta's claim to enforce his security interest. A court of equity may resolve issues of law in order to provide a complete remedy. *Harriman v. Northern Securities Co.*, 197 U.S. 244, 296, 25 S.Ct. 493, 504, 49 L.Ed. 739 (1904). The covenant not to compete was part and parcel of the fraudulent contract the parties reached. The covenant was allocated a separate consideration, but testimony established that this was done for tax purposes rather than any belief that this was an independent obligation. The court believes that the covenant not to compete had worth only because of the inflated value the fraud against the government gave this business. Spadafore and Solomon clearly would not have entered into this agreement had it not been for their belief that Falsetta was skimming and that they would be able to successfully continue this practice.

Accordingly the court dismisses the complaint of CNL against Falsetta and CN in its entirety.

B. *In pari delicto potior est conditio possidetis.*

■ Translated from Latin, this phrase means that in a case of equal or mutual

382

fault the condition of the party in possession is the better one. It has dual significance in this case. This rule is dispositive of the complaint filed originally by Falsetta to enforce his security interest. But it also impacts upon the outcome of chapter 11 proceedings in the base case.

Even when *Harriman, supra,* was decided in 1904 the rule of *in pari delicto* was considered settled law. *Harriman* was a ripple caused by a prior decision of the Court which upheld a decree that the formation of the Northern Securities Co. ("Northern") by several railroad magnates was an unlawful monopoly. Having made this determination the parties were faced with the task of dismantling Northern. A plan was proposed for the pro rata distribution of stock held by Northern in exchange for shares of its outstanding stock. Harriman, who had given a substantial block of stock to the company to capitalize it, sought to have his stock returned in its entirety rather than receive a pro rata share on the grounds that the contract to acquire the share was illegal as being in restraint of trade.

The Court was not impressed with this argument. Harriman, as one of the incorporators of Northern, was hardly in a position to assert that he had been harmed by the illegal venture upon which Northern embarked. In denying Harriman relief it stated:

When the parties are *in pari delicto,* and the contract has been fully executed on the part of the plaintiff, by the conveyance of property, or by the payment of money, and has not been repudiated by the defendant, it is now equally well settled that neither a court of law nor a court of equity will assist the plaintiff to recover back the property conveyed or the money paid under the contract.

*Id.* at 296, 25 S.Ct. at 504. The Court's ruling has lost none of its vitality in the intervening years.

Turning to the instant case, although Spadafore and Solomon's misdeeds deny them access to this court, Falsetta is in no better position. If not for his misrepresentation, there might have been no contract between these parties. More fundamentally, this court cannot pass on the validity of Falsetta's claim because to do so would require this court to also consider CNL's affirmative defense of fraud, which the court has already concluded it is barred from doing. Mr. Falsetta is *in pari delicto* with Spadafore and Solomon, and there he shall stay, without remedy from this court.

■ The court cannot leave this matter without addressing the effect that its ruling will have upon the underlying chapter 11 proceedings. Based upon the court's review of CNL's schedules it appears that CN is among the largest creditors in this case. Just as this court refuses on the basis of the unclean hands doctrine to enforce that claim, by the same doctrine the court must abstain from any ruling that requires this court to assign a value to that claim. If the adjudication of this claim is necessary to confirm a plan of reorganization, this court will not confirm the plan. This opinion is *res judicata* as to the competing claims between the parties, and the same result will occur if these parties bring their dispute before the court again, regardless of the context. Under the circumstances the court can see no other solution but for Falsetta, Spadafore, and Solomon to put aside their considerable animosity and find a solution agreeable to all which does not require the assistance of the court. Of course the parties are free to pursue whatever course they desire.

VI. Order.

For the foregoing reasons,

IT IS HEREBY ORDERED that Casa Nova, Inc.'s complaint against Casa Nova of Lansing, Inc., Casa Nova of Lansing, Inc.'s counterclaim against Casa Nova, Inc., and Casa Nova of Lansing, Inc.'s complaint against William Falsetta are each dismissed. The parties shall bear their own costs.